Queen Esther **ROBINSON**, et al., Plaintiffs,

v.

The **ALABAMA STATE DEPARTMENT OF EDUCATION**, et al., Defendants.

Civ. A. No. 86–T–569–N.

United States District Court, M.D. Alabama, N.D.

Nov. 27, 1989.

**1424**

Solomon S. Seay, Jr., Seay & Davis, Montgomery, Ala., for plaintiffs.

Theron Stokes, Montgomery, Ala., for Solomon Seay.

Denise Azar, Office of Gen. Counsel, Alabama Dept. of Educ., Montgomery, Ala., for all State defendants.

John H. England, Jr., England & Bivens, Tuscaloosa, Ala., for defendants, Perry Co. Bd. of Educ., Ray, Dozier, Melton, Rinehart, Scott & Carr.

Ralph N. Hobbs and Barry R. Bennett, Hobbs & Hain, Selma, Ala., for Selma City School Bd.

H.A. Lloyd, Lloyd, Dinning, Boggs & Dinning, Demopolis, Ala., for defendant Demopolis City Bd. of Educ.

John Hollis Jackson, Jr., Clanton, Ala., for defendant, Chilton County Bd. of Educ.

Martin Ray and Ray Ward, Ray, Oliver, Ward & Parsons, Tuscaloosa, Ala., for Bibb County Bd. of Educ.

David Boyd, Balch & Bingham, Montgomery, Ala., for defendant, Hale County Bd. of Educ.

James D. Freiley, Tuscaloosa, Ala., pro se.

Robert D. Segall and J. Fairley McDonald, III, Montgomery, Ala., for Perry Co. Historical Soc.

Robert H. Turner, Chestnut, Sanders, Sanders, Turner, Williams & Pettaway, Marion, Ala., for Perry Co. School Bd.

## ORDER

MYRON H. THOMPSON, District Judge.

This voting rights case, which has resulted in the consolidation of two Alabama school systems, is now before the court on the plaintiffs' supplemental motion for attorney's fees and expenses. For the reasons that follow, the court concludes that the plaintiffs are entitled to recover $52,410.00 in attorney's fees and $3,299.47 in expenses, to be assessed against defendant Perry County Board of Education.

### I.

This lawsuit, as commenced, charged that the City of Marion violated § 5 of the Voting Rights Act of 1965 [1] by transferring control of all public schools located within the city from an "elected" county board of education to an "appointed" city board of education without first obtaining federal approval. Earlier in this cause, a three-judge court agreed.[2] The court later issued an injunction requiring the defendants to reconsolidate the city and county school systems into one school system, the Perry County School System; the court also remanded this case to a single judge to implement its orders. This single-judge court later approved a consent decree detailing how the two school systems were to achieve reunification. The court also acknowledged that the plaintiffs were the prevailing party in this litigation and ordered payment of attorney's fees to them.

This matter is again before the court, this time on the plaintiffs' supplemental motion for attorney's fees and expenses. In this motion, they seek an award of attorney's fees and expenses for work done by their counsel subsequent to the entry of the consent decree.

---

**1.** 42 U.S.C.A. § 1973c.

**2.** *Robinson v. Alabama State Department of Education,* 652 F.Supp. 484 (M.D.Ala.1987) (three judge court).

## II.

The plaintiffs seek an award of attorney's fees under the Voting Rights Act. The Act provides that

In any action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the cost.

42 U.S.C.A. § 1973*l*(e). This provision, which is similar in substance and purpose to the Attorney's Fees Act of 1976,[3] serves the familiar purpose of encouraging private litigants to act as "private attorneys general" to vindicate their rights and the rights of the public at large, by guaranteeing to them, if they prevail, a reasonable attorney's fee.[4] With this provision, Congress sought to create an alternative means to ensure, without the expenditure of additional public funds, that the policies underlying the Voting Rights Act are implemented and enforced successfully. Guaranteed fees were considered to be essential to this end in light of concerns over the financial ability of victims of discrimination to bring such actions and the fact that the relief sought and obtained is often nonmonetary.[5]

■ Moreover, if these congressional objectives are to be met, courts must view guaranteed fees for prevailing plaintiffs as critical in both the remedial and liability phases of civil rights litigation. "[M]easures necessary to enforce the remedy ordered by the District Court cannot be divorced from the matters upon which [the plaintiffs] prevailed in securing the ... decree." *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air ("Delaware Valley I")*, 478 U.S. 546, 559, 106 S.Ct. 3088, 3095, 92 L.Ed.2d 439 (1986).

Therefore, a plaintiff should be entitled to recover not only those fees and expenses incurred as result of having obtained a favorable judgment or consent decree but also those incurred incident to monitoring and securing the defendant's compliance with that judgment or decree.[6]

■ The plaintiffs have established their entitlement to attorney's fees in this matter. In this phase of the litigation, the plaintiffs took on a role much more active than that of a mere monitor; they not only maintained vigilant oversight of the school system's progress, they frequently and actively pursued those actions without which it now appears the unified county school system would have been severely impaired. Indeed, the plaintiffs often represented the school system's interests in a better fashion than did the school system itself. For example, when several white students sought an exception to the interdistrict transfer plan, the Perry County School Board voiced no objections. However, recognizing the problems that this exception could cause the school district, the plaintiffs ably stepped in to fill the void caused by the board's abdication of its responsibility and defeated this proposal. Similarly, the plaintiffs were the ones who spearheaded retrieval of certain properties which should have come to the county school system upon consolidation; they also played a critical role in determining which schools, upon consolidation, should remain open and which should be closed. In these actions, despite clear evidence to the contrary, the Perry County School Board often took positions that could have threatened the economic and racial stability of the school system; fortunately, the

---

3. 42 U.S.C.A. § 1988.

4. Indeed, the similarity between the language and underlying purposes of the fee award provisions of the Voting Rights Act, § 1973*l*(e), the Attorney's Fees Act of 1976, § 1988, and the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e–5(k), has led the Eleventh Circuit to conclude that the standards for awarding fees under the various provisions should be generally the same. *Maloney v. City of Marietta,* 822 F.2d 1023, 1025 n. 2 (11th Cir.1987).

5. *Donnell v. United States,* 682 F.2d 240, 245–46 (D.C.Cir.1982), *cert. denied,* 459 U.S. 1204, 103 S.Ct. 1190, 75 L.Ed.2d 436 (1983).

6. *Turner v. Orr,* 785 F.2d 1498, 1503–04 (11th Cir.), *cert. denied,* 478 U.S. 1020, 106 S.Ct. 3332, 92 L.Ed.2d 738 (1986); *see also Adams v. Mathis,* 752 F.2d 553, 554 (11th Cir.1985) (per curiam); *Sims v. Montgomery County Commission,* 686 F.Supp. 878, 882 (M.D.Ala.1988).

plaintiffs were there to point out to both the school board and the court the correct path to take.

In light of these actions, the court concludes that the plaintiffs' most recent efforts "were reasonably related to the claims upon which plaintiffs were definitely successful and ... no doubt had the effect of maintaining compliance with the Court's [orders]." *Turner v. Orr,* 785 F.2d 1498, 1504 (11th Cir.), *cert. denied,* 478 U.S. 1020, 106 S.Ct. 3332, 92 L.Ed.2d 738 (1986), (*quoting Miller v. Carson,* 628 F.2d 346, 348 (5th Cir.1980)).

## III.

■ The starting point in setting any attorney's fee is determining the "lodestar" figure—that is, the product of the number of hours reasonably expended to prosecute the lawsuit and a reasonable hourly rate for non-contingent work performed by similarly situated attorneys in the community. After calculating the lodestar fee, the court should then proceed with an analysis of whether any portion of this fee should be adjusted upwards or downwards.[7]

In making the above determinations, the court is guided by the 12 factors set out in *Johnson v. Georgia Highway Express,* 488 F.2d 714, 717–19 (5th Cir.1974).[8] These factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill required to perform the legal services properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee in the community; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorney; (10) the "undesirability" of the case; (11) the nature and length of professional relationship with the client; and (12) awards in similar cases.

### A. Reasonable Hours

■ Solomon Seay represented the plaintiffs in this matter. Seay claims 174.7 hours for his work in monitoring and enforcing compliance with the consent decree and other orders.[9]

The court has considered two *Johnson* factors—the novelty and difficulty of the case, and the amount involved and the result obtained—in assessing the reasonableness of the hours claimed. As previously observed, Seay was involved in a variety of issues, ranging from determining which properties should be recovered for the use and benefit of the Perry County School System, to litigation to restrain interdistrict transfers which could have potentially undermined the ability of the school system to manage a successful transition. He handled these various tasks with aplomb and was highly successful in obtaining results favorable to the plaintiffs. In so doing, he helped ensure that the transition to a consolidated Perry County School System would proceed smoothly.[10]

Moreover, Seay's efforts in monitoring and enforcing compliance with the consent decree benefitted individuals far beyond the plaintiffs. As originally brought and litigated, this case concerned the enforcement of § 5 of the Voting Rights Act—a powerful piece of legislation "drafted to make the guarantees of the Fifteenth Amendment finally a reality. for all citizens." *Allen v. State Board of Elections,* 393 U.S. 544, 556, 89 S.Ct. 817, 826, 22 L.Ed.2d 1 (1969). With § 5's preclearance requirements, Congress sought to create a mechanism which would control the acts of those individuals who would attempt to contrive new and various methods to deny citizens their right to vote because of their

---

7. *Hensley v. Eckerhart,* 461 U.S. 424, 433–34, 103 S.Ct. 1933, 1939–40, 76 L.Ed.2d 40 (1983).

8. *See Blanchard v. Bergeron,* —— U.S. ——, ——, 109 S.Ct. 939, 943, 103 L.Ed.2d 67 (1989); *Hensley,* 461 U.S. at 434 n. 9, 103 S.Ct. at 1940 n. 9.

9. Seay has claimed 146.5 hours for the period from July 31, 1987, to February 3, 1989, and 28.2 hours for the period from February 9, 1989 to July 10, 1989.

10. *See Maloney v. City of Marietta,* 822 F.2d 1023, 1026 n. 5 (11th Cir.1987) ("Where there has been non-compliance, the actor whose litigation brings about compliance has protected important civil rights of minorities").

race.[11] In both the remedial and liability phases of this lawsuit, Seay vigorously pursued and vindicated the rights of all African–American voters in Perry County. Indeed, his work during the remedial phase, in assisting to establish a fiscally sound, well-managed, and unified county school system, can best be characterized as providing an investment in the future that will be of benefit to all citizens of Perry County.[12] Based on the above, the court finds that, as a general matter, the expenditure of 174.7 hours in monitoring and enforcing compliance was entirely reasonable.

Furthermore, the court has conducted an independent review of Seay's hours to determine if there was any time that should be excluded because it was "excessive, redundant, or otherwise unnecessary." *Hensley v. Eckerhart*, 461 U.S. 424, 434, 103 S.Ct. 1933, 1939–40, 76 L.Ed.2d 40 (1983). The court is satisfied that all of the hours listed appear to have been necessary, and directly related, to monitoring and securing compliance with prior orders.[13] The court therefore concludes that Seay is entitled to the full number of hours claimed.

### B. Prevailing Market Rate

[5] "A reasonable hourly rate is the prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience, and reputation." *Norman v. Housing Authority of Montgomery*, 836 F.2d 1292, 1299 (11th Cir.1988). To determine the prevailing market rate, the court will consider the following *Johnson* factors: customary fee; skill required to perform the legal services properly; the experience, reputation and ability of the attorney; time limitations; preclusion of other employment; undesirability of the case; nature and length of professional relationship with the client; and awards in similar cases.

■ Customary Fee: The plaintiffs contend that the customary fee for an attorney of similar experience in the community supports an hourly non-contingent fee of $150 for Seay. The evidence shows that, in Alabama, attorneys practicing in the same and similar areas of law with approximately the same experience and skill as Seay charge a non-contingent fee ranging between $100 and $150 an hour.[14]

Skill Required to Perform the Legal Services Properly: This court's determination that there had been a § 5 violation of the Voting Rights Act essentially transformed this matter into a school desegregation case. The plaintiffs' efforts during the remedial stage therefore focused on the work necessary to consolidate the City of Marion schools with the Perry County School System. These efforts required substantially different skills and knowledge from that originally necessary to litigate this action. As reflected by his work product in this remedial phase, by the success the plaintiffs have achieved, and by the efficient manner in which this matter has proceeded, Seay has demonstrated an impressive breadth of knowledge and ex-

**11.** *Allen v. State Board of Elections*, 393 U.S. at 565–66, 89 S.Ct. at 831–32; *South Carolina v. Katzenbach*, 383 U.S. 301, 335, 86 S.Ct. 803, 822, 15 L.Ed.2d 769 (1966).

**12.** *See Blanchard v. Bergeron*, —— U.S. ——, ——, 109 S.Ct. 939, 945–46, 103 L.Ed.2d 67 (1989) (reasonableness of attorney's fee award is dependent upon several factors including societal benefit); *City of Riverside v. Rivera*, 477 U.S. 561, 574–76, 106 S.Ct. 2686, 2694–95, 91 L.Ed.2d 466 (1986) (attorney's fee award in civil rights cases should reflect not only specific individual relief obtained but also any broad social benefit that may result directly or indirectly from the litigation).

**13.** Because Seay was the plaintiffs' only attorney in this matter, there was no risk of duplication of effort.

**14.** As originally envisioned by Congress, civil rights attorneys were to be paid on a par with commercial lawyers. *See* S.Rep. No. 1011, 94th Cong., 2d Sess. 6 (1976), 1976 U.S.Code Cong. & Admin.News 5908, 5913 ("It is intended that the amount of fees awarded under [§ 1988] be governed by the same standards which prevail in other types of equally complex Federal litigation, such as antitrust cases[,] and not be reduced because the rights involved may be nonpecuniary in nature.") Regrettably, this has not proved to be true. Indeed, if Seay when he completed law school had chosen to devote himself to a commercial, rather than public interest, law practice, he would today, in light of his ability, be able to command a substantially higher hourly rate.

pertise in handling the various facets of this litigation.[15]

Experience, Reputation, and Ability of the Attorney: Seay is generally considered to be, in the area of school-related litigation, one of the most experienced and respected members in the Alabama legal community. He has been active in the civil rights bar for almost 30 years, and he enjoys an admirable reputation among practitioners for his unswerving devotion to the eradication of racial and other forms of discrimination from all aspects of our daily lives. He, along with only 25 to 30 other attorneys in the state of Alabama, has struggled to fulfill this nation's promise of equal opportunity for all. The work done by Seay in this case was a reflection of the fine reputation he enjoys, and the effective and efficient manner in which he has monitored and secured compliance with all court orders establishes that he should be compensated at the upper limit of the range in which Alabama attorneys practicing in the same and similar areas of law are compensated.

Time Limitations: Where there has been "[p]riority work that delays the lawyer's other legal work," this factor requires "some premium." *Johnson*, 488 F.2d at 718. There is no evidence of such limitations here.

Preclusion of Other Employment: This factor "involves the dual consideration of otherwise available business which is foreclosed because of conflicts of interest which occur from the representation, and the fact that once the employment is undertaken the attorney is not free to use the time spent on the client's behalf for other

purposes." *Johnson*, 488 F.2d at 718. There is no substantial evidence of this factor.

Undesirability of the Case: In general, civil rights litigation is seen "as very undesirable because it stigmatizes an attorney as a 'civil rights lawyer' and thus tends to deter fee-paying clients, particularly high-paying commercial clients, from seeking assistance from that lawyer." *Stokes v. City of Montgomery*, 706 F.Supp. 811, 815 (M.D. Ala.1988), *aff'd*, 891 F.2d 905 (11th Cir. 1989) (table).[16] In cases involving issues of school desegregation, the stigmatizing effect on the attorney tends to be particularly pervasive because, in marked contrast to an employment discrimination case involving only one alleged victim, the issues raised and the relief sought have a direct effect on the lives of all members residing in the community. The results of such litigation tend to arouse the emotions of all concerned, and frequently the attorneys who bring these cases are the subjects of prolonged and vitriolic hostility.

Nature and Length of Relationship with Client: Seay has represented the plaintiffs in this matter from its inception. There is no evidence that Seay had a prior professional relationship with the plaintiffs.

Awards in Similar Cases: This court has awarded non-contingent fees in the range of $75–150 an hour in other civil rights cases.[17]

The court is of the opinion, based on these criteria, that the prevailing market rate for non-contingent work performed by attorneys of similar experience in similar cases is $150 an hour.[18]

---

**15.** *See Norman,* 836 F.2d at 1300–01.

**16.** *See also Hidle v. Geneva County Board of Education,* 681 F.Supp. 752, 756 (M.D.Ala.1988); *York v. Alabama State Board of Education,* 631 F.Supp. 78, 85 (M.D.Ala.1986).

**17.** *See, e.g., Stokes v. City of Montgomery,* 706 F.Supp. at 815; *Hidle v. Geneva County Board of Education,* 681 F.Supp. at 756; *Georgia Ass'n of Realtors v. Alabama Real Estate Commission,* 678 F.Supp. 854, 856–57 (M.D.Ala.1987); *Birl v. Wallis,* 649 F.Supp. 868, 872 (M.D.Ala.1986); *York v. Alabama State Board of Education,* 631 F.Supp. at 86.

**18.** By establishing the appropriate market rate on the basis of current rates, the court is also compensating plaintiffs' counsel for the delay in payment. *See Missouri v. Jenkins,* —— U.S. ——, ——, 109 S.Ct. 2463, 2469, 105 L.Ed.2d 229 (1989) ("an appropriate adjustment for delay in payment—whether by the application of current rather than historic hourly rates or otherwise— is within the contemplation of the statute"); *Norman,* 836 F.2d at 1302 ("[i]n this circuit, where there is a delay the court should take into account the time value of money and the effects of inflation and generally award compensation at current rates rather than at historic rates").

## C. Lodestar Calculation

The unadjusted lodestar for an attorney consists, as stated, of the product of the attorney's compensable hours multiplied by his prevailing market fee. Seay's lodestar—reflecting the product of his compensable hours, 174.7, and his prevailing market fee, $150—is $26,205.

## D. Adjustment

Plaintiffs' counsel seeks a 100% upward adjustment of the lodestar figure on the basis that he had a contingency arrangement with his clients. He notes that there are only 25 to 30 attorneys in the State of Alabama who specialize in civil rights litigation, and that their numbers are dwindling. Quoting from this court's opinion in *Stokes*, Seay argues that "only if attorneys who undertake such [civil rights] work are compensated, as are typical contingency fee attorneys, at a level that reflects the inherent risk of the contingency arrangement, will a sufficient number of competent counsel be attracted to represent alleged victims of ... discrimination who cannot afford to pay attorney fees." 706 F.Supp. at 817.

In both *Stokes* and *Hidle v. Geneva County Board of Education*, 681 F.Supp. 752 (M.D.Ala.1988), this court authorized a 100% enhancement as "necessary to meet th[e] bottom-end requirement for employment discrimination cases in Alabama." *Stokes*, 706 F.Supp. at 818. However, the mere fact that the court approved of such an enhancement in these two cases should not be understood as implying that this court will automatically award such increases. Rather, the court must look to the facts of the case before it and determine whether, under the applicable legal principles, an enhancement is appropriate.

■ The court has considered 11 of the 12 *Johnson* factors in its analysis and determination of the reasonableness of hours and fee rate claimed. The one factor that is yet to be considered is factor six, whether the fee is fixed or contingent. In *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air ("Delaware Valley II")*, 483 U.S. 711, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987), a majority of the Supreme Court held that attorney's fees may be enhanced due to contingency of payment. Looking to Justice O'Connor's concurring opinion in *Delaware Valley II* as controlling, the court finds that two prerequisites must be met *before* an enhancement may be made on the basis of contingency.[19] First, "unless the applicant can establish that without an adjustment for risk the prevailing party would have faced substantial difficulties in finding counsel in the local or other relevant market," enhancement for risk is inappropriate. *Id.*, at 733, 107 S.Ct. at 3091 (O'Connor, J., concurring) (quotation omitted). Second, "compensation for contingency must be based on the difference in market treatment of contingent fee cases *as a class*, rather than on an assessment of the 'riskiness' of any particular case." *Id.*, at 730, 107 S.Ct. at 3089 (emphasis in original).

### 1.

■ The Perry County School Board has objected to an enhancement on the ground that "the difficult legal issues were resolved prior to May 23, 1987," that is, before the entry of the consent decree. The court disagrees with this contention, both as a factual and legal matter. As the court has already observed, the legal issues in this stage of the litigation were quite different in nature from those originally perceived. This case, at its inception, was a voting rights case; however, it has been a school desegregation case since the plaintiffs prevailed at the liability stage. This complete transformation in focus and substance would have presented substantial difficulty for any attorney. Moreover, the shift in legal issues raised several new factual issues of varying complexity—e.g., tracing of property rights, determining appropriate funding levels, and monitoring

19. *See Lattimore v. Oman Construction*, 868 F.2d 437, 439 & n. 4 (11th Cir.1989) (per curiam) (discussing why Justice O'Connor's concurring opinion is controlling); *Stokes*, 706 F.Supp. at 816 (same).

proposed interdistrict transfers.[20]

Moreover, the Perry County School Board is incorrect in focusing its attention on only the activities conducted after the entry of the consent decree. "The risk of nonpayment should be determined at the beginning of the litigation." *Delaware Valley II*, 483 U.S. at 728, 107 S.Ct. at 3088 (White, J., plurality opinion). Additionally, the risk assessment should not be case specific but should encompass *the class* of civil rights cases.[21] To conduct an independent risk assessment at various points in the litigation, after an initial attorney's fee award has been made, would undermine the purposes behind the attorney's fee provision in the Voting Rights Act. As stated, one of Congress's primary reasons for enacting an attorney's fee provision was to ensure that individuals without financial resources would be able to vindicate civil rights guaranteed to them under law.[22] This end may be achieved only if there is an economic marketplace in which attorneys would be able to afford to represent civil rights plaintiffs.[23] The attorney's fee provision was envisioned as a means that would permit the civil rights plaintiff to attract counsel in the same manner as would any other plaintiff. When civil rights attorneys as well as private attorneys agree to assume the responsibility of litigating a case for which a fee is not promised up front, they make a risk assessment determination at the outset. Should the litigation later prove to be successful, the attorneys are rewarded for their willingness to assume the risk and vindicate important civil rights.

Indeed, the *Delaware Valley II* litigation provides an apt analogy to the situation currently before the court. In *Delaware Valley I*, the issue of attorney's fees arose in the context of work done *after* the district court had entered a consent decree.[24] It was within this context that a majority of the Supreme Court in *Delaware Valley II* found that a fee enhancement based on contingency was generally appropriate.[25]

In *Stokes* and *Hidle*, this court recounted both the manner in which the economic market in Alabama operated for attorneys compensated by virtue of contingent fee arrangements, and how the dearth of competent counsel willing to represent victims of discrimination was continuing to undermine civil rights legislation.[26] As in those two cases, the evidence in this case establishes that at the time Seay took on this case attorneys in Alabama were becoming increasingly unwilling to undertake civil rights litigation on a contingency basis because the cases frequently were not economical: the fees awarded for a successful case were not sufficiently high to justify taking the risk of losing the case, particularly given the availability of other more stable and profitable work.

## 2.

The evidence provided to this court established that in recent years, including the time in which Seay was retained to represent the plaintiffs, there were, on average, no more than 25 to 30 attorneys who specialized in handling civil rights cases in the

---

20. Indeed, this court has come to the conclusion that in lawsuits challenging institutional wrongs the remedial phase is often substantially more intellectually demanding than the liability phase.

21. *Id.,* at 731, 107 S.Ct. at 3090 (O'Connor, J., concurring) ("Haphazard and widely divergent compensation for risk can be avoided only if contingency cases are treated as class"); *see also id.,* at 747, 107 S.Ct. at 3098 (Blackmun, J., with whom Brennan, Marshall, and Stevens, JJ., join, dissenting) ("it is the fact of contingency, not the likelihood of success in any particular case, that mandates an increase in an attorney's fee").

22. *See Hensley v. Eckerhart*, 461 U.S. at 444–46, 103 S.Ct. at 1945–46; *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 418, 98 S.Ct. 694, 699, 54 L.Ed.2d 648 (1978).

23. *See Lattimore v. Oman Construction*, 868 F.2d 437, 439 (11th Cir.1989) (per curiam); *Stokes*, 706 F.Supp. at 816–18; *Hidle*, 681 F.Supp. at 756–59.

24. *See Delaware Valley I*, 478 U.S. at 549–53, 106 S.Ct. at 3090–92 (detailing the post-consent decree work done by plaintiffs' counsel).

25. *See note 19, supra.*

26. *Stokes*, 706 F.Supp. at 816–17; *Hidle*, 681 F.Supp. at 757–59.

entire State of Alabama.[27] As a result of this scarcity, plaintiffs often had great difficulty attracting competent counsel to handle their cases. Attorneys handling civil rights cases reported that neither they nor the other competent civil rights counsel within the state could handle all of the potentially meritorious suits presented to them; they said that they received approximately 15 telephone calls a week seeking to obtain their representation.

Explanations for this scarcity focused almost exclusively on the manner in which the economic market functions in Alabama. Attorneys with Seay's experience and expertise who represent non-civil rights clients could expect to be retained, with absolutely no risk of recovery, at an hourly rate substantially higher than $150. When a risk of recovery is factored into the picture, the hourly rate increased even more markedly. "The market principle in this state is that 'lawyers who are to be compensated only in the event of victory expect and are entitled to be paid more when successful than those who are assured of compensation regardless of result.'" *Stokes*, 706 F.Supp. at 816–17 (*quoting Jones v. Diamond*, 636 F.2d 1364, 1382 (5th Cir.) (en banc), *cert. dismissed sub nom. Ledbetter v. Jones*, 453 U.S. 950, 102 S.Ct. 27, 69 L.Ed.2d 1033 (1981)).

The evidence reveals that, in recent years, lawyers who accepted contingent fees while working in other areas of the law were compensated much more handsomely than were attorneys who worked in the civil rights area, and were confronted with a much smaller risk of loss. For example, attorneys who handled personal injury matters, bankruptcy, and debt collection on a contingency basis could expect to receive compensation that translated into hourly rates of between $300 and $1500 for their efforts.

There is also a second important difference between the markets: timeliness of payments.[28] Because a contingent fee arrangement results in payment to an attorney only if he or she is successful, delays in payment are to be expected. However, unlike the delays in civil rights cases which extended over a period of several years, the evidence shows that attorneys handling other cases, such as personal injury matters, could expect to receive remuneration within approximately 18 months. During the period between when the case was commenced and when payment was received, the attorney alone was responsible for the expenses, which would have to be accounted for and satisfied prior to the time that fees and costs were recovered. Not unexpectedly, as the duration of this interim period grew longer, civl rights attorneys confronted increasingly severe cash flow problems.

The combination of these two factors has led to the formation of a legal marketplace into which few attorneys are entering and from which attorneys are now fleeing. Of the few attorneys most highly regarded as civil rights practitioners in the State of Alabama, at least three have redirected their energies toward other legal disciplines within the last few years. Their stated motivation was that the civil rights market did not adequately compensate them. Unfortunately, the shift of these experienced practitioners was not offset by an influx of new attorneys willing to fill the void. Young attorneys, equally adept at making the same market comparisons as other practitioners, have also shied away from the civil rights field in favor of other, more lucrative and financially stable specialties.

**27.** Because there were so few attorneys in this field of law, and because all of them took cases from throughout the state, the relevant market in this case is the state of Alabama.

**28.** Delay in payment is, of course, one of the *Johnson* factors which the court has already considered in determining the lodestar. In discussing this factor again, the court is not suggesting that delay in payment, in and of itself in a particular case, is a proper basis for the court to make an adjustment to the lodestar. Instead, the purpose for this discussion is to explain the perceptions and realities of the manner in which the legal market operated in Alabama at the time plaintiffs' counsel accepted this case, and to identify those forces which have resulted in such a dire depletion of competent counsel whose livelihood consists of handling civil rights cases.

There has been, as a result, almost a 10% reduction in the number of civil rights attorneys within the state within the past few years. If this pattern continues unchecked, and the evidence before the court suggests that it will unless corrective measures are taken, the day will soon arrive when the state's civil rights bar will be little more than a memory. Ultimately, the real victims of this trend will be the citizenry of Alabama. Without lawyers available to champion the cause of impecunious victims of discrimination, the progress that has been made during the past four decades toward eradicating discrimination from this state will be halted, and the promise of equal treatment and opportunity for *all* will be but empty words.[29] Enhancement for risk in cases like this is therefore not only appropriate but essential if those who believe themselves to have been victims of discrimination are to have access to counsel.

### 3.

Given the economic market in which Alabama attorneys handling civil rights cases on a contingent fee basis have had to practice over the last five or six years, the real question appears to be not so much whether an enhancement is necessary, but rather what magnitude of enhancement is required to ensure that "lawyers who take cases on contingent bases are properly compensated for the risks inherent in such cases." *Delaware Valley II*, 483 U.S. at 752, 107 S.Ct. at 3101 (Blackmun, J., with whom Brennan, Marshall, and Stevens, JJ., join, dissenting). The court is guided by the Supreme Court's caution that a determination of reasonable attorney's fees should be large enough to attract competent counsel, and small enough that the attorney does not receive a "windfall." *Blum v. Stenson*, 465 U.S. 886, 897, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891 (1984) (*quoting* 1976 U.S.Code Cong. & Admin. News 5913).

The evidence presented to this court suggests that, to place plaintiffs' attorney in a position comparable to that of other Alabama attorneys who have obtained success litigating contingency cases, the court should award attorney's fees at the rate of approximately $600 an hour. However, two factors militate against such an award. First, as Justice O'Connor suggested, a fee enhancement should be no greater than necessary to bring the fee "within the range that would attract competent counsel." *Delaware Valley II*, 483 U.S. at 734, 107 S.Ct. at 3091 (O'Connor, J., concurring). All of the evidence presented suggests that the requested 100% enhancement is sufficient, albeit barely, to ensure a continuing economic market of regularly practicing, competent civil rights attorneys.

Second, Justice O'Connor cautioned lower courts that enhancements premised upon the market's treatment of risk inhering in a contingent fee arrangement should be determined consistently. "Haphazard and widely divergent compensation for risk can be avoided only if contingency cases are treated as a class; and contingency cases can be treated as a class only if courts strive for consistency from one fee deter-

---

**29.** Admittedly, the court has not discussed whether the plaintiffs *actually* had difficulty in obtaining counsel to bring the instant litigation. While some courts have intimated that such a finding is a prerequisite for awarding a fee enhancement, *see Leroy v. City of Houston*, 831 F.2d 576, 584 (5th Cir.1987), *cert. denied*, 486 U.S. 1008, 108 S.Ct. 1735, 100 L.Ed.2d 199 (1988), the court finds Judge Mikva's reasoning in *McKenzie v. Kennickell*, 875 F.2d 330, 337–38 (D.C.Cir.1989), to be much more persuasive. For one thing, looking to language used by both the plurality and Justice O'Connor in her concurrence in *Delaware Valley II*, it is apparent that the analysis to be conducted can best be characterized as being a retrospective, probability assessment. That is, the inquiry should not center upon what difficulties the plaintiffs *had* in obtaining counsel but rather more generally upon what difficulties the plaintiffs *would have faced* were counsel not to believe he would recover adjusted fees. *See Delaware Valley II*, 483 U.S. at 734, 107 S.Ct. at 3091 (O'Connor, J., concurring) ("unless the applicant can establish that without an adjustment for risk the prevailing party would have faced substantial difficulties in finding counsel in the local or other relevant market") (quotation omitted). Moreover, because this assessment is a market-based assessment rather than an individualized determination, this inquiry is more consistent with the Justice O'Connor's suggestion that the risk assessment be class-based, rather than individually focused.

mination to the next." *Id.,* at 731, 107 S.Ct. at 3090 (O'Connor, J., concurring). The need for consistency, from a market perspective, cannot be underestimated; attorneys will respond to fill the void in the currently depleted civil rights market only if they can be reassured at the outset, when they take a case, that, should they prevail in the litigation, the calculated return can be expected. If attorneys must factor into their initial cost-benefit calculus not only the traditional considerations of time required, probability of success, and compensation which might be available from other types of litigation, but must also include a probability assessment of whether the fee awarded will in fact be enhanced by the court, court-awarded enhancements will not suffice, all other things being equal, to bring about the requisite shift in supply of available, competent attorneys.

In at least three separate instances within the last few years, in cases brought in the Northern and Middle District of Alabama, an enhancement of 100% has been viewed as minimally necessary to attract competent counsel for civil rights cases.[30] *Delaware Valley II* strongly suggests that, absent special circumstances, this court should follow these earlier cases and award a similar enhancement. With a 100% adjustment, Seay is entitled to a fee of $52,410.

### IV.

Plaintiffs' counsel also seeks an award of $629.47 for certain expenses. " 'With the exception of routine office overhead normally absorbed by the practicing attorney, all reasonable expenses incurred in case preparation, during the course of litigation, or as an aspect of settlement of the case may be taxed as costs under section 1988' and 'the standard of reasonableness is to be given a liberal interpretation.' " *NAACP v. City*

*of Evergreen,* 812 F.2d 1332, 1337 (11th Cir.1987) (*quoting Dowdell v. City of Apopka,* 698 F.2d 1181, 1192 (11th Cir.1983)). Costs claimed in this matter include costs for copying, transcripts, witness fees, service of subpoenas, and travel reimbursement. All of these expenses appear to be reasonable and necessary.[31] Plaintiffs also claim $2,670.00 as costs incurred by Seay in hiring counsel to prosecute the fee application when the court requested an evidentiary hearing on the request for enhancement.[32] Under the circumstances, this action was reasonable, and the costs incurred are recoverable.[33] The court therefore determines that plaintiffs' counsel may recover a total of $3,299.47 for expenses.

It is therefore the ORDER, JUDGMENT, and DECREE of the court that the plaintiffs' supplemental motion for award of attorney's fees and expenses, filed February 6, 1989, is granted, and that the plaintiffs have and recover from defendant Perry County Board of Education the sum of $52,410.00 as attorney's fees and $3,299.47 for expenses, for a total sum of $55,709.47.

---

**30.** *See Lattimore v. Oman Construction,* 868 F.2d at 439; *Stokes,* 706 F.Supp. at 818; *Hidle,* 681 F.Supp. at 758.

**31.** *See generally Dowdell v. City of Apopka,* 698 F.2d at 1188–92.

**32.** Seay retained Theron Stokes, an attorney, to represent him at the hearing on attorney's fees. Stokes claims 17.8 hours at $150 an hour.

**33.** *Jonas v. Stack,* 758 F.2d 567, 569 (11th Cir. 1985).