Marion W. MEDDERS, et al., Plaintiffs,

v.

**AUTAUGA COUNTY BOARD
OF EDUCATION, et al.,**
Defendants,

v.

**ALABAMA DEMOCRATIC CONFER-
ENCE, Third–Party Defendant
and Counter–Plaintiff,**

Lafayette Alexander and Rev. J.D. Milli-
ner, for themselves and all others simi-
larly situated, Plaintiff–Intervenors and
Counter–Plaintiffs.

Civ. A. No. 3805–N.

United States District Court,
M.D. Alabama,
Northern Division.

July 5, 1994.

J. Robert Faulk, McDowell, Faulk & McDowell, Prattville, AL, for Autauga County, AL, J.H. Moody, William H. Caver, C.W. Deramus, J.O. Devaughn.

Clifford W. Cleveland, Cleveland & Colley, P.C., Prattville, AL, for Autauga County Bd. of Educ.

James U. Blacksher, Birmingham, AL, Neil Bradley, ACLU Foundation, Atlanta, GA, Edward Still, Birmingham, AL, for Alabama Democratic Conference, Lafayette Alexander, J.D. Milliner.

John R. Dunne, Steven H. Rosenbaum, John K. Tanner, Susanna Lorenzo–Giguere, U.S. Dept. of Justice, Civ. Rights Div., Voting Section, Washington, DC, Kenneth E. Vines, Charles Redding Pitt, U.S. Attorney's Office, Montgomery, AL, for U.S. Dept. of Justice.

Neil Bradley, ACLU Foundation, Atlanta, GA, Edward Still, Birmingham, AL, for Sallie M. Hadnott, amicus curiae.

## ORDER

MYRON H. THOMPSON, Chief Judge.

In this longstanding voting rights case, defendant Autauga County Board of Education initiated additional proceedings against a third-party defendant, the Alabama Democratic Conference (the "ADC"), seeking a declaratory judgment that the school board's system of electing its members from two multi-member districts complied with federal statutory and constitutional law.[1] The school board further sought authorization to submit the multi-member-district plan to the Attorney General of the United States for preclearance under § 5 of the Voting Rights Act of 1965, as amended. 42 U.S.C.A. § 1973c. Section 5 requires that states and local governments, subject to the section's coverage, obtain federal approval before they may implement any "standard, practice, or procedure with respect to voting." *Id.* A covered jurisdiction may obtain preclearance either by securing a determination from the District Court for the District of Columbia that the change "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color" or by submitting the change to the Attorney General of the United States and the Attorney General interposes no objection within a period of time allowed by law. *Id.*

The ADC, joined by two African–American residents of Autauga County who had been allowed to intervene, filed several counterclaims against the Autauga County Board of Education alleging that the school board's continued use of the multi-member-district plan violated their rights under § 5, as well as under § 2 of the Voting Rights Act of 1965, as amended, and the fourteenth and fifteenth amendments to the United States

---

1. The school board also added the United States Department of Justice as a party, but shortly thereafter the court dismissed the department without objection from the school board.

Constitution.[2] These three counter-plaintiffs sought, among other relief, approval of a plan under which five school board members would be elected from fairly drawn single-member districts. The school board and the counter-plaintiffs settled their dispute through a consent decree in which the board agreed to conduct its elections under a single-member-district plan—initially as a court-approved interim plan—and subsequently to seek preclearance from the Attorney General.

This lawsuit is again before the court, this time on a motion filed by the counter-plaintiffs claiming that they prevailed against the Autauga County Board of Education and that they are thus entitled to attorney's fees and costs from the Board pursuant to 42 U.S.C.A. § 1973*l* (e). For the reasons that follow, the court concludes that the motion should be granted and that the counter-plaintiffs are entitled to recover $9,062.50 in attorney's fees and $85.30 in expenses, plus interest on the expenses, from the school board.

## I.

In 1973, plaintiffs Marion W. Medders and other residents of Autauga County, Alabama, brought this lawsuit claiming that the districts from which the members of the Autauga County Board of Education were elected were malapportioned in violation of the fourteenth amendment to the United States Constitution. The members were elected from five single-member districts. By order entered on February 22, 1973, this court agreed and ordered that the districts be reapportioned. The school board submitted a plan that provided for two multi-member districts, one electing three members and the other electing two members. On September 28, 1973, the court ordered the adoption of the board's multi-member-district plan for the "primary and general elections of 1974." The court retained jurisdiction to review the plan's implementation and its long-range ef-

fect. The school board continued to use the plan for all elections between 1974 and the filing of these new proceedings.

The multi-member-district plan involved two changes in voting under § 5: (1) a change from election by five single-member districts to two multi-member districts; and (2) the adoption of new lines for the new districts. Notwithstanding these changes in voting, the multi-member-district plan was never submitted for preclearance.[3] On March 4, 1992, the Department of Justice orally advised counsel for the school board of the need to meet the requirements of § 5. On March 17, the board's superintendent received a letter from the field director of the ADC suggesting that a lawsuit would be filed against the board if it did not implement a fair redistricting plan with five single-member districts in time for the June 1992 primary elections.

On April 21, 1992, the school board initiated these new proceedings against the ADC, invoking the retained jurisdiction of this court. The board sought the following relief: (1) a declaratory judgment that its multi-member-district system was legal under federal law; (2) authorization to seek preclearance of the multi-member-district system from the Attorney General; and (3) an injunction against the June 1992 primary elections pending resolution of the validity of the multi-member-district system.

In May 1992, the ADC and two African-American voters, who had been allowed to join the ADC in this litigation, filed counterclaims charging that: (1) the board's implementation of the multi-member-district plan, without preclearance, violated § 5 of the Voting Rights Act; (2) the plan utilized malapportioned districts in violation of the fourteenth amendment; (3) under the existing plan, the political process leading to the election of board members was not equally open

---

2. Section 2 of the Voting Rights act provides, in relevant part, that "No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 42 U.S.C.A. § 1973(a).

3. It was clear that, at least as of 1981, such voting changes are subject to the preclearance requirements of § 5. *McDaniel v. Sanchez*, 452 U.S. 130, 153, 101 S.Ct. 2224, 2238, 68 L.Ed.2d 724 (1981) (preclearance requirement applies "whenever a covered jurisdiction submits a proposal reflecting the policy choices of the elected representatives of the people").

to participation by African–American citizens of Autauga County, in violation of § 2 of the Voting Rights Act; and (4) the board's continued use of the multi-member-district plan and refusal to adopt a single-member-district plan evidenced a purpose or intent to minimize the voting strength of African–American citizens of Autauga County, in violation of § 2 of the Voting Rights Act. In their prayer for relief, the counter-plaintiffs requested that the court require that the board adopt a fairly drawn single-member-district plan and obtain preclearance in time for the 1992 primary election or, in the alternative, that the court order the board to adopt such a plan on an interim basis, subject to later preclearance.

By order of June 18, 1992, the court approved a settlement reached between the school board and the counter-plaintiffs. The settlement provided that: (1) the multi-member-district plan was unconstitutional; (2) the board was permanently enjoined from conducting its elections under the multi-member-district plan; (3) the board was required to adopt the single-member-district plan used by the Autauga County Commission; (4) the board was required to submit the single-member-district plan to the Attorney General for preclearance; and (5) the 1992 election was to proceed under a modified schedule. The court approved the single-member-district plan as its own interim plan, pending preclearance by the Attorney General. Although the parties were thus able to settle all of their substantive claims, they were unable to agree upon whether the counter-plaintiffs were prevailing parties for the purpose of an award of attorney's fees and expenses. It is to this issue that the court now turns.

## II.

■ The Voting Rights Act of 1965, 42 U.S.C.A. § 1973*l* (e), authorizes courts to award reasonable attorney's fees to prevailing parties in actions or proceedings brought to enforce the voting guarantees of the fourteenth or fifteenth amendment to the United States Constitution.[4] Section 1973*l* (e), which is similar in substance and purpose to the Attorney's Fees Act of 1976, 42 U.S.C.A. § 1988, serves the familiar goal of encouraging private litigants to act as "private attorneys general" to vindicate their rights and the rights of the public at large, by guaranteeing to them, if they prevail, a reasonable attorney's fee. *Donnell v. United States,* 682 F.2d 240, 245–46 (D.C.Cir.1982), *cert. denied,* 459 U.S. 1204, 103 S.Ct. 1190, 75 L.Ed.2d 436 (1983).[5] With this provision, Congress sought to create an alternative means to assure, without the expenditure of additional public funds, that the policies underlying the Voting Rights Act are implemented and enforced successfully. To this end, guaranteed fees were considered essential in light of concerns over the financial ability of victims of discrimination to bring such actions and the fact that the relief sought and obtained is often nonmonetary. *Id.*

■ Moreover, in order for these congressional objectives to be met, the Eleventh Circuit Court of Appeals has instructed that, although the awarding of fees is labelled "discretionary" under § 1973*l* (e), the discretion of the trial court to deny fees to a prevailing party in these cases is "exceedingly narrow." *Maloney v. City of Marietta,* 822 F.2d 1023, 1025 (11th Cir.1987) (per curiam) (quoting *Solomon v. City of Gainesville,* 796 F.2d 1464, 1466 (11th Cir.1986)). Indeed, a prevailing plaintiff ordinarily is entitled to a fee award as a matter of course absent special circumstances that would render such an award unjust. *Id.*

---

4. Section 1973*l* (e) provides:

"In any action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment, the court, in its discretion, may allow a prevailing party, other than the United States, a reasonable attorney's fee as part of the costs."

5. Indeed, the similarity among the language and underlying purposes of the fee award provisions of the Voting Rights Act (§ 1973*l* (e)), the Attorney's Fees Act of 1976 (§ 1988), and the Civil Rights Act of 1964 (42 U.S.C.A. § 2000e–5(k)), has led the Eleventh Circuit to conclude that the standards for awarding fees under the various provisions should be generally the same. *Maloney v. City of Marietta,* 822 F.2d 1023, 1025 n. 2 (11th Cir.1987) (per curiam). *See also City of Burlington v. Dague,* —— U.S. ——, ——, 112 S.Ct. 2638, 2641, 120 L.Ed.2d 449 (1992) (case law construing what is a reasonable attorney's fee applies uniformly to all federal fee-shifting statutes).

In *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), the Supreme Court held that, for fee purposes under § 1988, a plaintiff may be considered a "prevailing party" if the plaintiff succeeds on "any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." *Id.* at 433, 103 S.Ct. at 1939 (quoting *Nadeau v. Helgemoe,* 581 F.2d 275, 278–79 (1st Cir.1978)). As the Supreme Court explained in *Texas State Teachers Ass'n v. Garland Indep. School Dist.,* 489 U.S. 782, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989), awards of attorney's fees are not dependent upon the plaintiff succeeding on *all* claims or even on achieving success on the "central" issue of the litigation. *Id.* at 790–91, 109 S.Ct. at 1492–93. All the significant-relief standard requires is that the plaintiff receive at least some relief on the merits of his claim. *Id.* at 792, 109 S.Ct. at 1493. As the Supreme Court explained in *Farrar v. Hobby,* —— U.S. ——, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992), the "plaintiff must obtain an enforceable judgment against the defendant from whom fees are sought ... or comparable relief through a consent decree or settlement." *Id.* at ——, 113 S.Ct. at 573 (citations omitted). "In short, a plaintiff 'prevails' when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff." *Id.*

■ Although the magnitude of relief obtained is irrelevant for purposes of determining whether a party has prevailed, it is relevant in determining whether fees should be awarded and, if so, how much. "In some circumstances, even a plaintiff who formally 'prevails' ... should receive no attorney's fees at all." *Farrar,* —— U.S. at ——, 113 S.Ct. at 575. One of the critical factors in determining the amount of the fee award is the plaintiff's "overall success." *Garland,* 489 U.S. at 793, 109 S.Ct. at 1494. If the plaintiff has technically prevailed but has essentially failed in obtaining any of the re-

lief sought, then "the only reasonable fee" may be "no fee at all." *Farrar,* —— U.S. at ——, 113 S.Ct. at 575.

The Autauga County Board of Education contends that the counter-plaintiffs did not prevail for purposes of § 1973*l* (e). First, the school board argues that both it and the counter-plaintiffs "prevailed." The board asserts that it initiated these proceedings against the ADC because it "needed to know whether the apportionment plan under which it was operating was constitutional or whether it needed to be changed." [6] That is, the board claims that it merely wanted to know, given the fact that both the Department of Justice and the ADC had suggested to it that its then-existing plan was unconstitutional, whether its plan was valid so there would be no "cloud" over the 1992 elections. The board argues that both it and the counter-plaintiffs received what they were seeking in this action through the negotiated settlement. Second, the school board seems to place some importance on the fact that it, and not the counter-plaintiffs, filed suit initially. Third, the board argues that the counter-plaintiffs should not be entitled to attorney's fees because the board did not "obstinately refuse[ ] to settle this case or otherwise cause[ ] the litigation to become protracted." [7] Finally, the school board asserts that it would be "unconscionable" to award attorney's fees in this case because its resources are already woefully inadequate to meet the educational needs of Autauga County's children.

■ First, the court does not agree that the school board can be considered a prevailing party. In its prayer for relief, the board specifically requested a ruling that its multi-member-district plan was legal and authorization to submit that plan to the Attorney General for preclearance. [8] Contrary to the board's assertion, therefore, it was not merely seeking an advisory opinion on whether the plan was legal—which the court could not give—but rather a ruling upholding the plan

---

**6.** Autauga County Board of Education's Response, etc., filed on April 7, 1993, at 2.

**7.** Autauga County Board of Education's Response, etc., filed on October 9, 1992, at 3.

**8.** The school board did not need to seek the court's authorization to submit the plan for preclearance.

as legal—which the board did not get. In the consent decree approved by the court, the multi-member-district plan was declared "malapportioned" and the court enjoined any further elections under that plan.

The school board also requested that, "pending a resolution of this controversy," the primary elections be enjoined "in order to prevent the unnecessary expenditure of resources by both incumbents and challengers to qualify and campaign for seats in districts which may be radically changed if this court should conclude that reapportionment is required." [9] Although the consent decree set forth a modified schedule for elections, it did not enjoin the primary election "pending a resolution" of the issues, but, rather, it did so concurrently with a declaration that the multi-member-district plan was malapportioned and an injunction to implement a single-member-district plan. Thus, the school board cannot be said to have prevailed on this request. Moreover, even if it did prevail in having the elections postponed, this request was one of timing only and not part of the substantive relief sought by the school board. The board, therefore, did not prevail and the counter-plaintiffs success should in no way be "offset."

■ The school board's remaining arguments are also of no avail. In determining whether a party prevailed for purposes of § 1973*l* (e), it is not relevant which party first brought the issue to the court. The dispositive question is which party prevailed. Whether the board behaved obstinately is also irrelevant for purposes of determining whether the counter-plaintiffs prevailed. The board's "reward" for not obstinately engaging in protracted litigation is a reduced number of hours charged against it by counsel for the counter-plaintiffs. Indeed, if the board had truly desired to avoid litigation, it could have simply adopted the single-member-district plan suggested by the Department of Justice and immediately submitted such a plan for preclearance. Finally, assuming that the board's limited amount of resources and the educational needs of Au-

tauga County's children are factors for the court's consideration, the court is not convinced that, in this case, these concerns override the directive of § 1973*l* (e) to award attorney's fees to those plaintiffs who are successful in their attempts to enforce the dictates of the Voting Rights Act.

■ The court concludes that the counter-plaintiffs prevailed in this action, that is, that they satisfied the "significant-relief" standard set forth above. Indeed, through the consent decree, counsel for the counter-plaintiffs achieved all the substantive relief they initially sought for their clients: a declaration that the Autauga County Board of Education may not lawfully conduct elections under the multi-member-district plan, the court's requirement that the board conduct elections under a single-member-district plan, and the court's adoption of the single-member-district plan as its own interim plan pending preclearance. Having attained such significant relief for their clients, counsel for the counter-plaintiffs are entitled to reasonable attorney's fees and expenses.

### III.

■ The starting point in setting any reasonable attorney's fee is determining the "lodestar" figure—that is, the product of the number of hours reasonably expended to prosecute the lawsuit and the reasonable hourly rate for work performed by similarly situated attorneys in the community. After calculating the lodestar fee, the court should then proceed with an analysis of whether any portion of this fee should be adjusted upwards or downwards. *Hensley v. Eckerhart,* 461 U.S. 424, 433–34, 103 S.Ct. 1933, 1939–40, 76 L.Ed.2d 40 (1983).

■ In making the above determinations, the court is guided by the 12 factors set out in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717–19 (5th Cir.1974). *See Blanchard v. Bergeron,* 489 U.S. 87, 91–92, 109 S.Ct. 939, 943, 103 L.Ed.2d 67 (1989); *Hensley,* 461 U.S. at 434 n. 9, 103 S.Ct. at 1940 n. 9. These factors are: (1) the time

---

9. *Autauga County Board of Education's Complaint for Declaratory Judgment,* filed on April 21, 1992, at 3.

and labor required; (2) the novelty and difficulty of the questions; (3) the skill required to perform the legal services properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee in the community; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorney; (10) the "undesirability" of the case; (11) the nature and length of professional relationship with the client; and (12) awards in similar cases.

## A. Reasonable Hours

James U. Blacksher and Edward Still represented the counter-plaintiffs in this matter. They seek compensation for the following hours:

| | |
|---|---|
| Still | 27.55 hours |
| Blacksher | 3.70 hours |

█ The court has considered two *Johnson* factors—the novelty and difficulty of the case, and the amount involved and the result obtained—in assessing the reasonableness of the hours claimed. A cursory review of such cases as *Brown v. Thomson,* 462 U.S. 835, 103 S.Ct. 2690, 77 L.Ed.2d 214 (1983), *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), and *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), would indicate that even the simplest one-person-one-vote case would be formidable to an attorney unfamiliar with the voting rights law. Because an attorney with less knowledge and experience than the counter-plaintiffs' attorneys would have taken many more hours to pursue this litigation, the number of hours claimed could be viewed as conservative. The court finds, in light of these circumstances, that all the hours expended and claimed were not "excessive, redundant, or otherwise unnecessary," *Hensley v. Eckerhart,* 461 U.S. 424, 434, 103 S.Ct. 1933, 1939–40, 76 L.Ed.2d 40 (1983), but were

necessary, and directly related, to securing the relief obtained. Still and Blacksher are entitled to the full number of hours claimed.

## B. Prevailing Market Rate

"A reasonable hourly rate is the prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience, and reputation." *Norman v. Housing Authority of Montgomery,* 836 F.2d 1292, 1299 (11th Cir. 1988). In this case, however, the counter-plaintiffs maintain that, although the Supreme Court in *City of Burlington v. Dague,* —— U.S. ——, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992), rejected an upward adjustment to the lodestar figure to account for risk of loss in contingent-fee cases, the Court did not prohibit consideration of contingency altogether. *See also McKenzie v. Cooper, Levins & Pastko, Inc.,* 990 F.2d 1183 (11th Cir. 1993) (relying on *Dague,* court reversed contingency enhancement as impermissible under federal fee-shifting statutes).[10] The counter-plaintiffs contend *Dague* merely requires that lower courts adopt a new approach in determining the reasonable hourly rate in contingent-fee cases. They argue that *Dague* rejects a market-based approach to setting the reasonable hourly rate in contingent-fee cases. Thus, instead of using a market analysis, the counter-plaintiffs maintain that courts must calculate the reasonable hourly rate in contingent-fee cases on a case-by-case, lawyer-by-lawyer basis. In other words, according to the counter-plaintiffs, courts cannot calculate the hourly rates for contingent-fee cases with reference to the prevailing market rate for non-contingent fee litigation, but must adopt a different model to account for the contingent-fee arrangement in the case. Thus, the reasonable hourly rate for non-contingent fee cases would be determined by a market approach, while the rate for contingent-fee would be calculated on a case-by-case basis. Furthermore, the

---

10. Although *McKenzie* was a Title VII case, the court in no way limited its holding to attorney's fees in Title VII cases, interpreting the Supreme Court's holding in *Dague* to preclude contingency enhancement "under federal fee-shifting statutes." 990 F.2d at 1186. Moreover, as previously noted, the Eleventh Circuit generally evaluates awards of attorney's fees in Title VII and Voting Rights Act cases under the same standards. *Brooks v. Georgia State Bd. of Elections,* 997 F.2d 857, 861 (11th Cir.1993); *Maloney v. City of Marietta,* 822 F.2d 1023, 1025 n. 2 (11th Cir.1987) (per curiam).

counter-plaintiffs maintain that although *Dague* prohibits upward adjustments to the lodestar figure to account for the risk of loss in contingent-fee cases, —— U.S. at —— ——, 112 S.Ct. at 2643–44, under a case-by-case approach, courts may consider contingency in setting the reasonable hourly rate in such cases. Indeed, the counter-plaintiffs press that when calculating the lodestar in contingent-fee cases, courts should increase the hourly rate usually appropriate in non-contingent fee litigation to account for the effects of the contingent-fee arrangement.

The court, however, cannot accept the counter-plaintiffs' arguments for several reasons. First, although *Dague* addresses directly only the use of contingency in adjusting the lodestar figure, the Court's reasons for rejecting contingency as a basis for enhancing the lodestar also dictate that contingency not be a factor in the setting of a reasonable hourly rate. According to the Court, consideration of contingency, which it defines as the risk of loss in a particular case, is "already subsumed in the lodestar." *Dague*, —— U.S. at ——, 112 S.Ct. at 2641. As the Court explained, one of the two factors that creates the risk of loss in a case—the difficulty of establishing the merits of a claim—is ordinarily already reflected in the lodestar "either in the higher number of hours expended to overcome the difficulty, or in the higher hourly rate of the attorney skilled and experienced enough to do so."[11] *Id.* Taking account of this factor again through enhancement of the lodestar "amounts to double-counting." *Id.*

■■■■ Applying the Court's reasoning, it would also be double-counting to enhance an attorney's hourly rate merely because of the contingent nature of the fee arrangement. Although the Court notes that some cases taken on contingency may require services of attorneys with greater skill and experience who command higher hourly rates, this observation does not indicate that the contingent-fee arrangement by its very nature requires a higher hourly rate. Rather, the

higher hourly rate is tied to the skill and experience of the attorney needed to overcome the difficulty of establishing a particular case on the merits, regardless of the fee arrangement. Thus, because the risk of loss in a particular case is already accounted for in the hourly rate commanded by the attorney whose services are required, to use contingency as an independent basis to enhance the hourly rate would result in the same double-dipping as if the court decided to enhance the lodestar based on contingency. It would also cut against the thrust of *Dague*, which rejects the use of contingency as a necessary feature in determining a reasonable fee. *Dague*, —— U.S. at ——, 112 S.Ct. at 2638. *See Davis v. City and County of San Francisco*, 976 F.2d 1536, 1549 (9th Cir. 1992) ("it would seem to be immaterial whether the consideration of contingency occurs in deciding to apply a multiplier to the lodestar fee or in initially calculating the lodestar"), *vacated in part on other grounds*, 984 F.2d 345 (9th Cir.1993); *Watkins v. Fordice*, 807 F.Supp. 406, 417 (S.D.Miss. 1992) (three-judge court) (rejecting the use of contingency as an independent consideration in setting hourly rates).

Second, this court's reading of *Dague* does not support the counter-plaintiffs' contention that the Supreme Court has rejected a market-based approach to calculating the lodestar figure in contingent-fee cases and that the lodestar figure must be calculated differently depending on the nature of the fee arrangement in the case. Although the Court states that "there is no market treatment" of contingent fee cases as a class, *Dague*, —— U.S. at ——, 112 S.Ct. at 2642, this observation does not lead to an overall rejection of a market-based analysis in calculating the lodestar figure in contingent-fee cases. The Court merely rejects the idea that contingent-fee cases constitute a distinct legal market and that a reasonable fee award in contingent-fee cases should reflect that distinct market. Admittedly, the Court's reasoning is not explicit, but its opinion suggests that the relevant market to be used in

---

11. The Court pinpoints the legal and factual merits of a claim as the other factor that produces the risk of loss in a particular case. However, the Court states that the legal and factual merits

of a claim, unlike the difficulty of establishing the merits of a claim, should play no part in calculating the lodestar. *Dague*, —— U.S. at ——, 112 S.Ct. at 2641.

determining a reasonable fee award in contingent-fee cases is the prevailing market in non-contingent fee cases. That is, by refusing to acknowledge the market treatment of contingent-fee cases as a class and thereby eliminating contingency as a distinct factor in determining fee awards, the Court erases any distinction between non-contingent and contingent-fee cases for purposes of fee awards. Thus, the relevant market from which a court selects a reasonable fee would be the same in both situations: the market of non-contingent fee cases. In other words, implicit in the Court's opinion is that a correlation can be established between services provided in non-contingent fee cases and those provided in contingent-fee cases and that the hourly rates charged in non-contingent fee litigation are appropriate rates also for similar services in contingent-fee cases. The Court's opinion in *Dague* therefore indicates a result precisely contrary to that suggested by the counter-plaintiffs. Because the hourly rates for contingent and non-contingent fee awards are to be calculated with reference to the same market, there needs to be only one lodestar model, not two.

■ Therefore, to determine the reasonable hourly rate for the services rendered in this case, the court will look to the prevailing market rate in the community for similar services rendered in non-contingent fee litigation by lawyers of reasonably comparable skill, experience, and reputation. In so doing, however, the court also recognizes the difficulties that may arise in using such an approach to determining a reasonable fee in contingent-fee cases. As the Supreme Court has itself acknowledged, in some cases it may not be easy to establish a correlation between the types of services rendered in non-contingent cases and those provided in contingent-fee cases brought under federal fee-shifting statutes and to determine an appropriate hourly rate. *See Blum v. Stenson,* 465

U.S. 886, 895 n. 11, 104 S.Ct. 1541, 1547 n. 11, 79 L.Ed.2d 891 (1984). To assist in making these determinations, the court will be guided by the following *Johnson* factors: customary fee; whether the fee is fixed or contingent; the novelty and difficulty of the questions; skill required to perform the legal services properly; the experience, reputation and ability of the attorney; time limitations; preclusion of other employment; undesirability of the case; nature and length of professional relationship with the client; and awards in similar cases.

■ *Customary Fee:* The counter-plaintiffs contend that the customary fee for an attorney of similar experience in the community supports an hourly non-contingent fee of $350 for Still and Blacksher. The evidence shows that Alabama attorneys practicing in the same and similar areas of law with approximately the same experience and skill as counter-plaintiffs' attorneys charge a non-contingent fee of at least $290 an hour.[12]

*Fixed or Contingent Fee:* This factor focuses judicial scrutiny solely on the existence of any contract for fees that may have been executed between the party and his attorney. *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 483 U.S. 711, 723, 107 S.Ct. 3078, 3085, 97 L.Ed.2d 585 (1987). "The fee quoted to the client or the percentage of the recovery agreed to is helpful in demonstrating the attorney's fee expectations when he accepted the case." *Johnson,* 488 F.2d at 718. In this case, there was no written agreement which would demonstrate the attorney's fee expectations.

*Novelty and Difficulty of the Questions:* Still and Blacksher contend that this case presented novel and difficult § 5 issues. Although the court believes that all voting rights litigation is challenging, this case was

---

**12.** As originally envisioned by Congress, civil rights attorneys were to be paid on a par with commercial lawyers. *See* S.Rep. No. 1011, 94th Cong., 2d Sess. 6 (1976), 1976 U.S.Code Cong. & Admin.News 5913 ("It is intended that the amount of fees awarded under [§ 1988] be governed by the same standards which prevail in other types of equally complex Federal litigation, such as antitrust cases[,] and not be reduced

because the rights involved may be nonpecuniary in nature.") Regrettably, this has not proved to be true. Indeed, if plaintiffs' attorneys when they completed law school had chosen to devote themselves to commercial rather than public interest law, they would today, in light of their abilities, be able to command a substantially higher hourly rate.

not sufficiently more difficult to justify an enhancement on this basis.

*Skill Required to Perform the Legal Services Properly:* It cannot be questioned that voting rights litigation requires a highly skilled attorney. As explained earlier, even the simplest voting rights case would be daunting to an attorney who had not specialized in voting rights law.

*Experience, Reputation, and Ability of the Attorney:* Still and Blacksher have now rightfully earned the reputation as two of the most experienced, knowledgeable, and able voting rights lawyers in the State of Alabama, if not the nation. They have to their credit such trail-blazing cases as *Bolden v. City of Mobile,* 423 F.Supp. 384 (S.D.Ala. 1976), *aff'd,* 571 F.2d 238 (5th Cir.1978), *rev'd and remanded,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), *reaff'd on remand,* 542 F.Supp. 1050 (S.D.Ala.1982), and *Hunter v. Underwood,* 471 U.S. 222, 105 S.Ct. 1916, 85 L.Ed.2d 222 (1985). Blacksher has also written extensively in the area. *See, e.g.,* J. Blacksher and L. Menefee, "At–Large Elections and One Person, One Vote: The Search for the Meaning of Racial Vote Dilution," in C. Davidson (ed.), Minority Vote Dilution (1984).

*Time Limitations:* Where there has been "[p]riority work that delays the lawyer's other legal work," this factor requires "some premium." *Johnson,* 488 F.2d at 718. The case was litigated under the pressure of an impending election.

*Preclusion of Other Employment:* This factor "involves the dual consideration of otherwise available business which is foreclosed because of conflicts of interest which occur from the representation, and the fact that once the employment is undertaken the attorney is not free to use the time spent on the client's behalf for other purposes." *Johnson,* 488 F.2d at 718. There is no evidence to support this factor.

*Undesirability of the Case:* In general, civil rights litigation is seen "as very undesirable because it stigmatizes an attorney as a 'civil rights lawyer' and thus tends to deter fee-paying clients, particularly high-paying commercial clients, from seeking assistance from that lawyer." *Stokes v. City of Montgomery,* 706 F.Supp. 811, 815 (M.D.Ala.1988), *aff'd,* 891 F.2d 905 (11th Cir.1989) (table).[13] The results of such litigation tend to arouse the emotions of all concerned, and frequently the attorneys who bring these cases are the subjects of prolonged and vitriolic hostility.

*Nature and Length of Relationship with Client:* Still and Blacksher have represented the counter-plaintiffs in this matter from its inception. The court is also aware that they have represented the ADC in a number of voting rights cases across the State of Alabama. *See, e.g., Dillard v. Baldwin County Board of Education,* 686 F.Supp. 1459 (M.D.Ala.1988).

*Awards in Similar Cases:* Still and Blacksher have been awarded $350 an hour in one voting rights case, *Lawrence v. City of Talladega,* C.A. No. 91–C–1340–M (N.D.Ala. May 17, 1993), and $290 an hour in another, *Dillard v. City of Elba,* 87–T–1201–N, 1993 WL 738117 (M.D.Ala. Oct. 20, 1993).

The court is of the opinion, based on these criteria, that the current market rate for work performed by attorneys of similar knowledge and experience in similar cases is at least $290 an hour. In addition, by establishing the appropriate market rate on the basis of current rates, the court is also compensating counter-plaintiffs' counsel for the delay in payment. *See Missouri v. Jenkins,* 491 U.S. 274, 284, 109 S.Ct. 2463, 2469, 105 L.Ed.2d 229 (1989) ("an appropriate adjustment for delay in payment—whether by the application of current rather than historic hourly rates or otherwise—is within the contemplation of the statute"); *Norman,* 836 F.2d at 1302 ("[i]n this circuit, where there is a delay the court should take into account the time value of money and the effects of inflation and generally award compensation at current rates rather than at historic rates").

---

**13.** *See also Robinson v. Alabama State Dept. of Educ.,* 727 F.Supp. 1422 (M.D.Ala.1989), *aff'd,* 918 F.2d 183 (11th Cir.1990) (table); *Hidle v. Geneva County Bd. of Educ.,* 681 F.Supp. 752, 756 (M.D.Ala.1988); *York v. Alabama State Bd. of Educ.,* 631 F.Supp. 78, 85 (M.D.Ala.1986).

## C. Lodestar Calculation

The unadjusted lodestar for an attorney consists, as stated, of the product of the attorney's compensable hours multiplied by his prevailing market fee. The lodestars for counter-plaintiffs' counsel are therefore as follows:

| | | | |
|---|---|---|---|
| Still | 27.55 hours × $290 | = | $7,989.50 |
| Blacksher | 3.70 hours × $290 | = | $1,073.00 |
| Total | | | $9,062.50 |

## D. Adjustment

An adjustment neither upward nor downward is warranted.

## IV.

■■■ Counsel for counter-plaintiffs also seek an award of $85.30 for certain expenses. With the exception of routine overhead office expenses normally absorbed by the practicing attorney, all reasonable expenses incurred in case preparation, during the course of litigation or as an aspect of settlement of the case, may be taxed as costs; the standard of reasonableness is to be given a liberal interpretation. *NAACP v. City of Evergreen*, 812 F.2d 1332, 1337 (11th Cir. 1987); *Dowdell v. City of Apopka*, 698 F.2d 1181, 1192 (11th Cir.1983). Expenses claimed in this matter include costs for long distance telephone calls and photocopying. These expenses appear to be reasonable and necessary and the Board has not questioned the expenses claimed. The court therefore determines that counsel for counter-plaintiffs may recover the expenses requested.

■■ Counter-plaintiffs also request an award of interest on both the attorney's fees and expenses from the date of the original judgment. While the court compensated for the time-value of money lost because of the delay in payment of attorney's fees by awarding those fees on the basis of current, as opposed to historical, market rates, such a method of compensation is impossible where fixed-cost expenses, such as photocopying and telephone charges, are involved. The court, therefore, will order an award of interest on these costs. As the Eleventh Circuit explained in *BankAtlantic v. Blythe Eastman Paine Webber, Inc.*, 12 F.3d 1045 (11th Cir.1994), "Supreme Court and this circuit's precedent is clear: 'When a district court taxes costs against a losing party, the award of costs bears interest from the date of the original judgment.'" *Id.* at 1052 (quoting *Georgia Ass'n of Retarded Citizens v. McDaniel*, 855 F.2d 794, 799 (11th Cir.1988)). In this case, the court approved the consent decree on June 18, 1992. Under the provisions of 28 U.S.C.A. § 1961, the interest rate for this judgment has been set at 4.26% and is to be compounded annually.[14] Accordingly, counter-plaintiffs are entitled to $85.30 plus an amount equal to 4.26% interest from June 18, 1992, until the date of payment, compounded annually.

It is therefore the ORDER, JUDGMENT, and DECREE of the court that the motion for an award of attorney's fees, filed by counter-plaintiffs Alabama Democratic Conference, Lafayette Alexander, and J.D. Milliner on September 16, 1992, and corrected on March 2, 1993, is granted, and that the counter-plaintiffs have and recover from defendant Autauga County Board of Education the sum of $9,062.50 as attorney's fees and $85.30 for expenses (plus 4.26% interest on expenses, compounded annually from June 18, 1992, until the date of payment).

---

**14.** 28 U.S.C.A. § 1961 has been held by the Eleventh Circuit to apply to awards of costs where only equitable relief was at issue in the case, even though the statute is directed to interest on "money judgments." *McDaniel*, 855 F.2d at 799–800; *BankAtlantic*, 12 F.3d at 1052. Counsel for the counter-plaintiffs have represented to the court that the interest rate for this judgment, calculated under the provisions of § 1961 and as determined by the Administrative Office of the United States Courts, is 4.26%. Because the Board has not challenged this rate, the court accepts it as correct.