John DILLARD, et al., Plaintiffs,

v.

CITY OF FOLEY, Defendant.

Civil Action No. 87–T–1213–N.

United States District Court,
M.D. Alabama,
Northern Division.

Feb. 13, 1998.

James U. Blacksher, Birmingham, AL, Neil Bradley, Laughlin McDonald, Mary Wyckoff, ACLU Foundation, Atlanta, GA, Julius L. Chambers, Scherlyn Ifill, Jacqueline A. Berrien, NAACP Legal Defense Fund, New York City, J. Gerald Hebert, Alexandria, VA, Edward Still, Lawyers' Committee for Civil Rights Under Law, Washington, DC, for John Dillard, Damascus Crittenden, Jr., Earwen Ferrell, Clarence J. Jarrells, Ullysses McBride, Louis Hall, Jr.

Clement C. Torbert, Jr., Maynard, Cooper & Gale, P.C., Montgomery, AL, Caine O'Rear, III, Hand Arendall, L.L.C., Mobile, AL, Mortimer Parker Ames, III, James H. Evans, Office of the Attorney General, Montgomery, AL, C.G. Chason, Chason & Underwood, Foley, AL, for City of Foley.

## ORDER

MYRON H. THOMPSON, Chief Judge.

On September 27, 1994, the plaintiffs, representatives of a class of African–Americans, filed a motion in this long-standing lawsuit petitioning the court for further relief and claiming that defendant City of Foley, Alabama, had engaged in racially-discriminatory annexation policies in violation of § 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C.A. § 1973 (West 1994), and the fourteenth and fifteenth amendments to the United States Constitution, as enforced through 42 U.S.C.A. § 1983 (West 1994). By order entered on October 30, 1995, the court approved a consent decree submitted in settlement of the plaintiffs' claims. *Dillard v. City of Foley,* 926 F.Supp. 1053 (M.D.Ala. 1995) (Thompson, J.). This case is now before the court on the plaintiffs' motion for award of fees and expenses, as twice amended. The plaintiffs seek $185,493.12 ($174,666.25 in attorneys' fees and $10,826.87 in expenses).[1] For the reasons that follow, the motion will be granted to the extent that the court will award $127,605.77.

## I.

The history of this lawsuit may be summarized as follows. The suit originated in 1985 as a class action challenging Foley's at-large method of electing city council members as a violation of § 2 of the Voting Rights Act.[2] In an order entered on May 16, 1989, the court found that the election system was in violation of § 2, and Foley subsequently modified its election procedures and received preclearance for its election scheme from the United States Department of Justice pursuant to § 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C.A. § 1973c (West 1994). The court retained its jurisdiction over the case pursuant to an agreement of the parties.

In 1989 and 1993, pursuant to § 5, Foley made submissions to the Department of Justice regarding a series of annexations it sought of areas outside of the city boundaries. The Attorney General objected to several of the annexations, stating that an attempted 1993 annexation "reflected a continuation of the city's ... practice of annexing areas that can be expected to contain predominantly white population, while discouraging the annexation of areas of predomi-

---

1. The plaintiffs' fee request may be broken down as follows:

| Attorneys | Hours | | Rates | Individual Fee |
|---|---|---|---|---|
| J. Gerald Hebert | 381.90 | x | $325 | $124,117.50 |
| Edward Still | 150.55 | x | $325 | 48,928.75 |
| Neil Bradley | 7.20 | x | $225 | 1,620.00 |
| Total | | | | $174,666.25 |

*See* Notice of clerical error, filed on Nov. 12, 1996; Plaintiffs' second revised motion for an award of fees, costs and expenses, filed on Oct. 2, 1996.

2. This lawsuit is one of many *Dillard* cases, which had their origin in 1985, challenging at-large election systems across Alabama. The court traced the evolution of these cases in some detail in *Dillard v. Baldwin County Bd. of Educ.,* 686 F.Supp. 1459, 1461 (M.D.Ala.1988) (Thompson, J.).

nantly black population." Specifically, the Attorney General cited Foley's failure to offer a legitimate, non-racial justification for its willingness to encourage annexation petitions from majority-white residential areas while discouraging and rejecting petition efforts from two majority-black residential areas, Mills Quarters and Beulah Heights. Foley did not respond to the Attorney General's objections and did not make any remedial efforts. Because they had not received the necessary § 5 preclearance, none of Foley's attempted residential annexations since 1989 was legally enforceable.

On September 27, 1994, the plaintiffs filed a motion petitioning this court for further relief, claiming that Foley had engaged in racially-discriminatory annexation policies in violation of § 2 and the fourteenth and fifteenth amendments. According to the plaintiffs, the City of Foley had consistently "applied disparate and more difficult standards for annexation of geographic areas wherein black citizens reside than the standards applied to geographic areas wherein white citizens reside or will reside." As evidence of the racially-selective annexation policy, the plaintiffs alleged that Mills Quarters had actively sought annexation and was rejected by Foley, and that Beulah Heights had petitioned for annexation and never got a response from Foley. Meanwhile, the plaintiffs alleged, Foley affirmatively sought annexation of areas with mostly white residents.

On June 28, 1995, after engaging in settlement negotiations mediated by a Magistrate Judge, the parties submitted a joint motion for settlement and a proposed consent decree. Shortly thereafter, the City of Gulf Shores and three individual residents of Foley objected to the proposed consent decree, and Gulf Shores moved to intervene. On October 30, 1995, after holding a hearing at which it considered the motion for intervention and various objections to the consent decree, and provided an opportunity for class and non-class members to express their opinions on the proposed settlement, the court entered an order approving the consent decree and denying intervention by Gulf

Shores. *Dillard v. City of Foley*, 926 F.Supp. 1053 (M.D.Ala.1995) (Thompson, J.). The court later denied intervention by the three Foley residents as well. *Dillard v. City of Foley*, 166 F.R.D. 503 (M.D.Ala.1996) (Thompson, J.).

Gulf Shores and the individual objectors subsequently appealed the court's denial of their motions to intervene, which appeal was dismissed as moot by the Eleventh Circuit Court of Appeals. The pending motion for a fee award and expenses followed on July 30, 1996, and was amended on August 23 and October 2, 1996.

## II. DISCUSSION

The plaintiffs contend that they are entitled to their attorneys' fees and expenses because they have prevailed on all of the claims asserted in their motion for further relief, and thus they are "prevailing parties" for purposes of a fee award under 42 U.S.C.A. § 1988. Foley disagrees, arguing that the plaintiffs may not be considered prevailing parties because Foley, at the time the plaintiffs filed their motion seeking further relief, had already embarked upon the course of action leading to the annexation of Beulah Heights and Mills Quarters, prompted not by any of the plaintiffs' efforts, but by the Department of Justice's prior objections to Foley's annexation practices. The court will, therefore, first consider whether the plaintiffs are in fact prevailing parties.

### A.

▇ It is well settled that a plaintiff is no less eligible for a fee award as a prevailing party because his or her lawsuit terminated favorably on the basis of a consent judgment, rather than through litigation and a judicial determination that the plaintiff's rights have been violated. *See Farrar v. Hobby*, 506 U.S. 103, 111, 113 S.Ct. 566, 573, 121 L.Ed.2d 494 (1992); *Maher v. Gagne*, 448 U.S. 122, 129–130, 100 S.Ct. 2570, 2575, 65 L.Ed.2d 653 (1980); *Lee v. Randolph County Bd. of Educ.*, 885 F.Supp. 1526, 1529

(M.D.Ala.1995) (Thompson, J.). "It follows from this principle that, in those class actions where court approval is necessary before a consent decree may be entered, plaintiffs should be allowed to recover fees incident to the negotiation and approval process." *Lee,* 885 F.Supp. at 1529.

Foley does not dispute the applicability of these principles to the plaintiffs' request for a fee award. Nor does it dispute that the plaintiffs obtained substantially all of their desired relief in the consent decree. Instead, Foley seeks to avoid responsibility for all, or at least a significant portion of, the plaintiffs' fees and expenses by arguing that the plaintiffs have failed to establish that the filing of their motion for further relief was "a substantial factor or a significant catalyst in motivating" Foley to end its unconstitutional behavior.[3]

In proffering this argument, Foley seeks to import into the present inquiry the considerations employed by courts applying the so-called "catalyst theory," under which a plaintiff may attain prevailing party status if she demonstrates that her lawsuit was a causal link prompting the defendants to take appropriate remedial action which in some way vindicated her asserted claim. *See, e.g., Royal Crown Cola Co. v. Coca–Cola Co.,* 887 F.2d 1480, 1486 (11th Cir.1989) ("Nonetheless, even in the absence of judicial relief, a plaintiff may still be a prevailing party if the plaintiff can show that his or her lawsuit was a causal link prompting some remedial action.... Such a causal connection or link is established by evidence that the lawsuit was a substantial factor or a significant catalyst in motivating the defendants to end their unlawful behavior."), *cert. denied,* 497 U.S. 1011, 110 S.Ct. 3258, 111 L.Ed.2d 767 (1990); *Fields v. City of Tarpon Springs,* 721 F.2d 318, 321 (11th Cir.1983) ("To determine if a party has prevailed when there is no judicial relief this circuit has used the catalyst test. The catalyst test of prevailing party requires

showing that the lawsuit is a causal link that prompted some remedial action."); *see also Gingras v. Lloyd,* 740 F.2d 210, 213 (2d Cir.1984) (Congress did not "intend[] that fees be awarded to a plaintiff ... who obtained only benefits that the defendant plainly would have conferred even in the absence of a lawsuit."); *American Constitutional Party v. Munro,* 650 F.2d 184, 188 (9th Cir. 1981) ("[T]he courts have required consistently that plaintiffs seeking to qualify as 'prevailing parties' establish some sort of clear, *causal relationship* between the litigation brought and the practical outcome realized.") (emphasis in original). However, the catalyst theory is typically applied where the absence of formal judicial relief makes it necessary for the court to determine whether the plaintiff truly was successful, and therefore has earned prevailing party status. *See Taylor v. City of Fort Lauderdale,* 810 F.2d 1551, 1560 (11th Cir.1987). Here, by contrast, the plaintiffs obtained an enforceable, final judgment in which the court approved the consent decree that granted the plaintiffs' desired relief. Consequently, it is not immediately apparent whether the causal-relationship test properly applies here, where the litigation has culminated in an enforceable consent decree, rather than in an out-of-court settlement or the voluntary mooting of a controversy before trial.

At least one court has held that the catalyst test is inapplicable under these circumstances. In *Kilgour v. City of Pasadena,* 53 F.3d 1007, 1009 (1995), the Ninth Circuit Court of Appeals reversed the trial court's ruling that the plaintiffs, who had obtained an enforceable stipulated judgment in their favor, were not entitled to attorneys' fees because they had failed to demonstrate that they were a "significant catalyst" in achieving the favorable result. *Id.* at 1010–11. The Ninth Circuit held that the trial court had erred because it should never have reached the catalyst test in making the prevailing party determination. *Id.* at 1011.

**3.** Defendant's supporting brief in opposition to plaintiffs' revised motion for award of fees, costs

and expenses, filed on Sept. 23, 1996, at 18–20.

Instead, the *Kilgour* court concluded that the plaintiffs had satisfied the standard enunciated by the Supreme Court in *Farrar v. Hobby,* 506 U.S. 103, 113, 113 S.Ct. 566, 573, 121 L.Ed.2d 494 (1992), under which they had only to show that a "material alteration of the legal relationship between the parties" has occurred, as established when "the plaintiff becomes entitled to enforce a judgment, consent decree, or settlement against the defendant." *Kilgour,* 53 F.3d at 1011. The plaintiffs in *Kilgour* fulfilled this requirement because they had obtained an enforceable stipulated judgment.[4] *Id.*

Other courts, by contrast, have applied the catalyst test, or at least have inquired into the causal connection between the lawsuit and the relief obtained, even where the litigation culminated in an enforceable consent decree. *See Charles v. Coleman,* 689 F.2d 774, 776 (8th Cir.1982) (court rejects argument that plaintiffs did not prevail because the defendant would have provided the relief afforded by a consent decree regardless of the litigation, but only because the record was devoid of affirmative evidence that the plaintiffs' action had no connection with the

relief secured); *Nadeau v. Helgemoe,* 581 F.2d 275 (1st Cir.1978) (court remands case to trial court for a determination of whether "the plaintiffs' suit and their attorney's efforts were a necessary and important factor in achieving the improvements" imposed by a consent decree);[5] *T.Y. v. Board of County Comm'rs of the County of Shawnee,* 912 F.Supp. 1416, 1419–21 (D.Kan.1995) (court applies a two-prong catalyst test, including a determination of whether the plaintiffs' lawsuit was "a substantial factor or significant catalyst" prompting the defendants to act, where the parties executed a settlement agreement and consent decree).

The Eleventh Circuit Court of Appeals has not yet had occasion to address the question of whether the catalyst theory's causal-relationship test should be applied where the plaintiff has secured an enforceable consent decree in the course of litigation. It is not necessary, however, for this court to decide the issue, because it finds that the plaintiffs' claim to prevailing party status passes muster even when put to the causal-relationship test, as explained below.

■ This court has described the application of the catalyst test as follows: "At bot-

---

**4.** Two other aspects of the *Kilgour* decision warrant further comment. First, the Ninth Circuit, though it held the catalyst test to be inapplicable where an enforceable stipulated judgment had been obtained, noted that "a catalyst-type analysis" could factor into the court's determination of the degree of success achieved by the plaintiff, which under *Farrar* does not affect *eligibility* for a fee award, but does go to the reasonableness of the award. *Kilgour,* 53 F.3d at 1011 n. 4.

Second, the Ninth Circuit did in fact consider whether the record established that the plaintiffs' lawsuit seeking immediate injunctive relief "triggered" the settlement. *Id.* at 1012. It reached this question because the district court had held that, even if the plaintiffs could be deemed prevailing parties, "special circumstances" justified an award of no fees, because "the matter would have been settled in as timely a fashion without [the plaintiffs'] lawsuit having ever been filed." *Id.* at 1011. The Ninth Circuit reversed this holding as well, concluding that "nothing in the record supports the finding that the matter would have been settled in as timely a fashion—and on the same terms as in the stipulated judgment....—without [the plaintiffs'] lawsuit." *Id.* at 1012.

**5.** The court notes that these cases pre-date *Farrar.* However, *Farrar* itself does not specifically

address whether courts should examine whether there is a causal relationship between the litigation resulting in the consent decree and the relief obtained in that decree, and therefore it is not altogether clear whether *Charles* and *Nadeau's* application of the catalyst test in the consent decree context survives *Farrar.* A persuasive argument can be made that the catalyst test need not be employed where the litigation culminates in a consent decree, because the true purpose of the test is to permit courts to gauge whether a defendant's voluntary remedial action was genuinely motivated by the lawsuit, where that action is extra-judicial and thus potentially unrelated to the litigation. Where, by contrast, a consent decree has been entered, there is little doubt that the relief obtained by the plaintiff was indeed motivated by the lawsuit, thus obviating the need to ascertain whether the requisite causal link has been established.

In any event, as explained below, this court need not determine whether after *Farrar* the catalyst test should not be employed in the consent-decree context, because it finds that the plaintiffs here are prevailing parties even if their claim for a fee award is subjected to that test.

tom, whether the final outcome is due to a plaintiff's efforts—that is, provoking a defendant into taking certain steps to bring itself into compliance with its legal duties—and, thus, whether plaintiff has prevailed, is an intensely factual, pragmatic issue." *W.T. v. Andalusia City Schools,* 977 F.Supp. 1437, 1443 (M.D.Ala.1997) (Thompson, J.). "Clues to the provocative effects of the plaintiff's legal efforts are often best gleaned from the chronology of events, the nature of the relief sought and obtained, and the role of the plaintiff's action in activating the change." *Id.* Moreover, the law does not require a plaintiff to show that his litigation was the only cause of the defendants' action; "the catalyst theory merely requires that [the plaintiff] show that the litigation 'played a substantial role' in the defendants' remedial action." *Id.* at 1466 (quoting *Royal Crown Cola Co.,* 887 F.2d at 1486). "Motivation 'is frequently multipurposed.'" *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 265 n. 11, 97 S.Ct. 555, 563 n. 11, 50 L.Ed.2d 450 (1977). The removal, therefore, of even a "'subordinate purpose' may change the outcome. *Id.*" *W.T.,* 977 F.Supp. at 1446.

Foley contends that the requisite causal connection or catalytic effect has not been established here, where the plaintiffs' efforts post-date Foley's decision to annex Beulah Heights and the portion of Mills Quarters addressed in the consent decree. Foley points to the fact that the Department of Justice's concerns about its annexation practices were brought to Foley's attention in August 1993, over a year prior to the filing of the plaintiffs' motion for further relief. Foley also directs the court's attention to the fact that by January 1994 it had already enlisted the services of a consultant to help it develop a comprehensive annexation plan for the city, and that a draft plan had been prepared by August 31, 1994, almost a full month prior to the filing of the plaintiffs' motion for further relief. The real driving force behind these early actions, Foley contends, was not any conduct on the plaintiffs' part, but rather the prior objections raised by the Department of Justice to Foley's annexation practices.

In support of its argument, Foley relies primarily upon two decisions, *Craig v. Gregg County,* 988 F.2d 18 (5th Cir.1993), and *Jackson v. Stevenson,* 666 F.Supp. 99 (S.D.Miss. 1986). In *Craig,* the Fifth Circuit Court of Appeals affirmed the denial of attorneys' fees to a plaintiff in a Voting Rights Act case whose claim proceeded under the catalyst theory. The plaintiff had obtained neither an enforceable judgment nor a consent decree or other settlement, but contended that he was a prevailing party because the defendant county had ultimately developed a districting plan that complied with the Act and satisfied the plaintiff's concerns. Although it was not until after the plaintiff brought suit that the county had developed the plan and submitted it to the Department of Justice for preclearance, the court refused to deem the plaintiff a prevailing party absent any evidence that his suit spurred the county to develop the plan. *Craig,* 988 F.2d at 21. Specifically, the court noted that by the time the plaintiff filed suit in district court, the county had already presented the proposed voting scheme to the Department of Justice, and had also filed suit in the District of Columbia seeking a declaration that the proposed scheme was free from discriminatory purpose and effect. *Id.* at 19, 21. Borrowing language from an earlier Fifth Circuit decision, the *Craig* court noted that "Late arrivers cannot jump the train as it leaves the station and hope to seize prevailing plaintiff status." *Id.* at 21 (citing *Posada v. Lamb County,* 716 F.2d 1066, 1071 (5th Cir.1983)). Without evidence to the contrary, the court concluded, "it may be inferred that the train had been moving toward revision from the time the County submitted the original districting plan to the Department of Justice for approval." *Id.* In other words, the court would not award the plaintiff attorneys' fees "for demanding that [the county] do something that it was going to do anyway." *Id.*

The district court in *Jackson* reached a similar conclusion where the stipulated facts showed that, even before the plaintiffs filed

suit challenging the defendant county board of supervisor's failure to adopt a redistricting plan, the board had "already begun the process of redistricting and that [it] conscientiously strove toward that end regardless of plaintiffs' actions." 666 F.Supp. at 101.

To counter Foley's argument and distinguish the present dispute from those at issue in *Craig* and *Jackson,* the plaintiffs point to numerous facts in the record suggesting that Foley's initial, pre-litigation efforts to annex Beulah Heights and Mills Quarters were tentative at best, and insincere at worst. For instance, the plaintiffs point to the sworn declaration of Foley's city administrator, in which he states merely that Foley "began considering" the annexation prior to, and independently of, the plaintiffs' involvement in this issue, and not that the city intended at that point actually to annex the areas in question.[6] The plaintiffs also direct the court's attention to two additional "incidents" that illustrate the insincerity and tentativeness of Foley's consideration of annexation prior to, and even shortly after, the filing of the plaintiffs' motion for further relief. Specifically, the plaintiffs quote a letter from Foley's counsel to plaintiffs' counsel, written after Foley's counsel represented to the court that the city was considering annexation, which stated in part: "Never at anytime have I indicated or stated that in my opinion the City *intended* to annex Beulah Heights and Mills Quarters."[7] Although they do not say so explicitly, it appears that the plaintiffs, on the basis of this letter, contend that Foley was not *seriously* considering, and certainly had not yet decided to, annex the areas in question even after the motion for further relief was filed. If this is true, the plaintiffs apparently argue, surely the decision to carry out the annexation did not occur until *after* the plaintiffs' involvement in this issue, and only as a direct result of their litigation efforts.

The second incident cited by the plaintiffs as evidence of Foley's initial insincerity in

pursuing annexation is a Foley city council meeting that took place on December 13, 1994, less than three months after the motion for further relief was filed.[8] At the meeting, the Council took up the issue of the annexation of Beulah Heights and Mills Quarter. According to the plaintiffs, even though Foley was purportedly "considering" annexation at this time, it presented a wholly negative picture of annexation to the residents of the areas in question, emphasizing the potential costs and other adverse consequences that residents of the affected areas would incur as a result of the annexation.[9]

The plaintiffs argue, in essence, that the rationale underlying *Craig* and *Jackson* holds no sway here, because, to extend the metaphor employed in those decisions, far from hopping a departing locomotive, the plaintiffs actually set the train on its ultimately-fruitful course at a time when it was not clear that it would ever leave the station. The court, though it is not convinced that Foley's actions evince the degree of speciousness or foot-dragging suggested by the plaintiffs, does agree that the foregoing evidence demonstrates that the plaintiffs' efforts contributed substantially to the accomplishment of their objectives in this litigation. The court reiterates that the plaintiffs' lawsuit does not have to be the sole cause of Foley's action in order for them to be deemed prevailing parties; they need only show that the litigation played a "substantial role" in causing the remedial action. *See W.T.,* 977 F.Supp. at 1446. The evidence described above indicates that Foley, at the time the plaintiffs' motion was filed, and even shortly thereafter, *did not yet fully intend to annex the disputed* areas, but was merely in the process of considering whether annexation should be pursued. Additionally, the court finds that Foley, even if it did not actively discourage residents from seeking annexation, as alleged by the plaintiffs, was less than enthusiastic about annexing Beulah Heights and Mills

---

6. Plaintiffs' reply brief in support of motion for award of attorneys' fees and expenses, filed on October 2, 1996, at 1–2.

7. *Id.* at exh. 5 (emphasis added).

8. *Id.* at 2–3.

9. *Id.*

Quarters before the plaintiffs' motion was filed and pressure was exerted on the city. The change in Foley's posture that resulted from the plaintiffs' application of pressure in the lawsuit is most evident in the consent decree itself, where Foley agreed not to take any actions to discourage residents from voting in favor of annexation, and indeed stated its desire to annex the areas at issue and agreement to encourage the residents to support annexation.[10] Thus, the court concludes that the filing of the plaintiffs' motion for further relief and the plaintiffs' subsequent efforts to negotiate a settlement played the requisite substantial role in causing Foley to undertake remedial action as set forth in the consent decree, and that the plaintiffs are therefore prevailing parties entitled to their attorneys' fees and expenses.

This conclusion is consistent with *Craig* and *Jackson*, the two decisions cited by Foley in opposition to the plaintiffs' motion for a fee award, because here, unlike in those two cases, the plaintiffs have presented persuasive evidence that the lawsuit actually prompted a change in the defendant's conduct and thus spurred it to take remedial measures it would likely not have otherwise pursued. Consequently, this court is unwilling to infer, as did the court in *Craig*, "that the train had been moving toward" the ultimate outcome from the time Foley began its investigation into the possibility of annexing the disputed areas in January 1995. 988 F.2d at 21. Given Foley's apparent initial resistance to annexation of the areas at issue, as described above, and the indications in the record that Foley had not formed an actual intention to annex those areas even after the plaintiffs had filed the motion for further relief, it can hardly be said that the plaintiffs seek attorneys' fees merely for demanding that Foley "do something that it was going to do anyway." *Id.*

Moreover, the foregoing conclusion is consistent with this court's recent decisions in *Sumbry v. Russell County*, 993 F.Supp. 1439 (M.D.Ala.1998) (Thompson, J.), and *White v.*

*Alabama*, 1998 WL 60938 (M.D.Ala.1998) (Thompson, J.). In *Sumbry*, the plaintiff-intervenor sought a fee award under 42 U.S.C.A. §§ 1973*l* (e) and 1988, claiming that his litigation efforts had resulted in the termination of a prior consent decree that had implemented an impermissibly racially-motivated county commission election system. Because it found that any relief obtained by the plaintiff-intervenor could be traced only to his pre-litigation efforts and the defendant county commission's subsequent voluntary action, but not to any of his litigation activities, this court refused to confer prevailing party status on the plaintiff-intervenor under the catalyst theory. In reaching its decision, this court emphasized that by the time the plaintiff-intervenor had filed his complaint-in-intervention, the defendant county commission had already taken all possible official action to seek a legislative change that would moot the controversy, and that nothing the plaintiff-intervenor did or said in the course of the litigation put pressure on or influenced the county commission's actions. 993 F.Supp. at 1445, 1447.

Here, by contrast, the record demonstrates that the plaintiffs' litigation efforts did put Foley's feet to the fire and spur the city into action · favorable to the plaintiffs' cause. By no means had Foley undertaken all possible remedial action by the time the plaintiffs filed their motion for further relief, and the evidence does not establish that Foley had set in motion a course of action that would lead inexorably to annexation of Beulah Heights and Mills Quarters without the plaintiffs' prodding.

In *White*, this court was presented with a scenario somewhat more analogous to that presented here. The plaintiffs in *White* were found to be prevailing parties in their successful efforts to force the state defendants to obtain preclearance for four statutes governing the election of state judges. Although two of the statutes at issue in *White* had already been submitted to the Justice De-

---

**10.** Consent decree, entered on October 30, 1995, at ¶ 16.

partment for preclearance by the time the plaintiffs initiated their lawsuit, this court nevertheless held that the plaintiffs were prevailing parties as to those statutes on the ground that the defendants had taken the position in litigation that preclearance was unnecessary because the statutes had been precleared by implication earlier. 1998 WL 60938 at *——, slip op., at 13. Thus, this court found that the plaintiffs' lawsuit was a catalyst in that it kept pressure on the state defendants to follow through on their efforts to obtain preclearance. *Id.*

Similarly, as explained above, the plaintiffs here are prevailing parties because they successfully pressured Foley to follow through on its initial, somewhat tentative, efforts to annex Beulah Heights and Mills Quarters.

Accordingly, the court concludes that the plaintiffs have established that they are prevailing parties for purposes of obtaining their attorneys' fees and expenses.

### B.

▇ Having found that the plaintiffs are prevailing parties, the court must next determine the appropriate amount of fees and expenses to be awarded. As this court has repeatedly stated, the starting point in setting any attorney's fee is determining the "lodestar" figure—that is, the product of the number of hours reasonably expended to prosecute the lawsuit and the reasonable hourly rate for work performed by similarly situated attorneys in the community. *Norman v. Housing Authority of City of Montgomery*, 836 F.2d 1292, 1299 (11th Cir.1988); *accord Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983). The fee applicant bears the burden of "establishing entitlement and documenting the appropriate hours and hourly rates." *Norman,* 836 F.2d at 1303. After calculating the lodestar fee, the court should then proceed with an analysis of whether any portion of this fee should be adjusted upwards or downwards. *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 U.S. 546, 565–66, 106 S.Ct. 3088, 3098, 92 L.Ed.2d 439 (1986); *see also Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 483 U.S. 711, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987); *Hensley,* 461 U.S. at 433–34, 103 S.Ct. at 1939–40.

▇ In making the above determinations, the court is guided by the 12 factors set out in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717–19 (5th Cir.1974).[11] *See Blanchard v. Bergeron,* 489 U.S. 87, 91–92, 109 S.Ct. 939, 943–44, 103 L.Ed.2d 67 (1989); *Hensley,* 461 U.S. at 434 n. 9, 103 S.Ct. at 1940 n. 9. These factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill required to perform the legal services properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee in the community; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of professional relationship with the client; and (12) awards in similar cases.

### *Reasonable Hours*

Three attorneys, J. Gerald Hebert, Edward Still, and Neil Bradley, represented the plaintiffs in this matter. Hebert seeks compensation for 381.90 hours, Still seeks compensation for 150.55 hours, and Bradley seeks compensation for 7.20 hours.

▇ The court considers three *Johnson* factors—the time and labor required, the novelty and difficulty of the case, and the amount involved and the result obtained—in assessing the reasonableness of the hours claimed by the plaintiffs' counsel. Foley proffers several arguments as to why the

---

**11.** In *Bonner v. Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

number of hours for which the plaintiffs' attorneys seek compensation is unreasonable and should be substantially reduced. First, Foley argues that the plaintiffs are at most "partially prevailing parties" entitled only to the fraction of the fees and expenses incurred by their attorneys during the negotiations that led up to the court's approval of the consent decree. Any work performed subsequent to that point, Foley maintains, pertained merely to "remedial," rather than "liability," issues, and the two sets of issues should be treated distinctly, because the plaintiffs may not be said to have prevailed as to the remedial matters. Second, Foley contends that the hours billed by Hebert as "travel time" are clearly excessive, because they would not have been incurred had the plaintiffs hired a local attorney to litigate the case, and because such time is essentially unproductive and thus does not warrant full compensation. Third, Foley urges that no compensation, or at most 50% of the compensation sought, should be made for the hours logged by both Still and Hebert as "review" time. Fourth, Foley argues that the 54.65 hours ascribed to work by Still and Hebert pertaining to the third-party motions to intervene and the related appeal to the Eleventh Circuit should are not compensable, because Foley's attorneys performed all of the work on these issues. Finally, Foley complains that the hours devoted to litigation of the attorneys' fees issues for which the plaintiffs' counsel seek compensation are clearly excessive. The court will take up each of these arguments in turn.

In support of its first contention, that the plaintiffs' counsel should be compensated only for the work performed prior to this court's approval of the consent decree, Foley relies upon two decisions, *Daggett v. Kimmelman*, 864 F.2d 1122 (3d Cir.1989), and *Doulin v. White*, 549 F.Supp. 152 (E.D.Ark.1982). Foley is correct to observe that these decisions establish that, at least in a redistricting action in which there is a clear demarcation between the "liability" and "remedy" phases, a party may prevail as to one phase, but not the second. For instance,

in *Doulin*, the district court held that the plaintiffs were prevailing parties entitled to attorneys' fees with respect to the liability stage of the litigation, but that they had not prevailed at the subsequent relief stage because each of the redistricting plans submitted by the plaintiffs was rejected by the court in favor of a different plan submitted by another party. 549 F.Supp. at 156–57.

Thus, Foley urges the court to divide the present litigation, in both analytical and chronological terms, into two distinct phases: a pre-consent decree phase, when the parties were working in an adversarial mode to negotiate a settlement that served their respective self-interests, and a subsequent post-consent decree phase, when, according to Foley, its attorneys performed all of the work necessary to set up the annexation referenda and general election, obtain all necessary approvals from the Department of Justice, and complete other tasks that were necessary to effect the annexation of Beulah Heights and Mills Quarters as specified in the consent decree. Because Foley succeeded in completing these tasks and accomplishing the annexation, it argues that, to the extent any party can be said to have "prevailed" at the post-consent decree, "remedial" phase, it is Foley and not the plaintiffs that prevailed. Accordingly, Foley contends, the court should reject the plaintiffs' fee request to the extent that they seek compensation for work performed after the consent decree was approved by the court.

The court does not agree that a clean line of demarcation separates the "liability" and "remedial" stages of this litigation, nor that Foley may be deemed a prevailing party with respect to the post-consent decree activities. As the plaintiffs contend, they do not seek compensation for the work performed by Foley's attorneys; consequently, the question is not, as Foley appears to assert, whether its attorneys or the plaintiffs' attorneys devoted more time to the implementation activities. Rather, the court must examine all of the hours for which the plaintiffs' attorneys seek compensation, including those that occurred after the consent decree was approved, to

ascertain whether they warrant compensation. Other than the blanket assertion that *all* post-consent decree hours are non-compensable, Foley fails to point to any specific hours or categories of hours within that time frame that it contends are unreasonable or excessive, and why.[12] In the absence of such a showing, the court has independently investigated the reasonableness of the post-consent decree hours for which compensation is sought, and finds that these hours are compensable in their entirety, with the exception of certain hours pertaining to the current battle over the fee award, as explained in detail below. It is beyond dispute that the plaintiffs' counsel were responsible for ensuring that their clients interests were taken into account during the post-consent decree phase of this litigation, and the court finds that the hours expended by counsel during that period to see that the annexation process was fully carried out, and to attend to other tasks related to that process, are manifestly reasonable.

■ Regarding Foley's second contention, that no compensation should be had for Hebert's hours billed as "travel time," the court notes that other courts have reduced the compensation of out-of-town counsel, or have refused to compensate them at all, for travel time where the case could have been litigated ably by local counsel. *See Smith v. Freeman*, 921 F.2d 1120, 1122 (10th Cir.1990) (holding that district court did not abuse its discretion by compensating attorney for unproductive car travel at 25% of standard hourly rate); *McDonald v. Armontrout*, 860 F.2d 1456, 1462–63 (8th Cir.1988) (upholding 50% reduction in rate of compensation for travel time); *Brown v. Unified School Dist. No. 501, Shawnee County*, 878 F.Supp. 1430, 1437 (D.Kan.1995) (refusing to compensate out-of-town attorneys for travel time); *Fantasy Inc. v. Fogerty*, No. C 85–4929–SC, 1995 WL 261504, at *6 (N.D.Cal.1995) (accepting the principle that attorney travel time should not be awarded except where "local counsel

was unavailable, either because they were unwilling or unable to perform because they lack the degree of experience, expertise, or specialization required to handle properly the case," but holding that travel time should be compensated under the circumstances, where there was no evidence that a local attorney would be as specialized as out-of-town counsel, "in the sense of having both the experience in copyright law and familiarity with the two parties that these two attorneys possessed").

Here, Foley contends that experienced and willing local counsel existed, so that the plaintiffs were not compelled to hire Hebert, an attorney whose office is located near Washington, D.C. The court agrees that such counsel could have been retained, but recognizes that Hebert is an exceptionally qualified attorney on the types of issues raised by this litigation, and it is not unreasonable that the plaintiffs should have enlisted his aid. Accordingly, the court, while it does not find that Hebert should be denied compensation for his travel time, will reduce his travel-time compensation to reflect the fact that able local counsel could have been retained.

Adjustment of Hebert's travel time is complicated because it is not immediately apparent from a review of his billing records exactly how many hours were devoted exclusively to travel, and, further, how much of Hebert's actual travel time was productively employed to perform case-related tasks. Hebert's billing records reflect that he seeks compensation for 79.5 hours of travel time between out-of-town locations and Montgomery or Foley, Alabama. It is clear from the billing records that this time includes hours devoted to other tasks in the case, such as the review and preparation of documents, but the time entries unfortunately do not specify how much time was taken up by automobile travel or airplane travel during which no such work was performed. Hebert represents to the court that he endeavored to make use of his travel time whenever possible to perform

---

**12.** The exception to this omission is that Foley has objected to the broad category of "travel time" and "review time," including such time expended after the consent decree was approved. The propriety of compensating the plaintiffs' counsel for this time is addressed below.

case-related tasks. Therefore, for the 79.5 hours designated as including travel time in Hebert's billing records, the court will assume that Hebert devoted 50% of that time to actual work on the case, and will compensate him fully for that time. *Cf. Hearn v. General Electric Co.,* 1996 WL 937034 (M.D.Ala. Sept. 12, 1996) (refusing to compensate attorney at his standard hourly rate for unspecified "travel" time, where there is no indication whether the time was used productively). In other words, the court will compensate Hebert at his full hourly rate for one-half of his claimed 79.5 hours, that is, 39.75 hours. The remaining 39.75 hours, which the court assumes were devoted exclusively to travel, and not to other productive work on the case, will be discounted by 50% to account for the fact that the time was otherwise unproductive, and that local counsel could have been retained. Thus, Hebert will be compensated for these 39.75 hours at 50% of his hourly rate, as calculated below. The court notes that had Hebert more carefully specified exactly what portion of his travel time was devoted to case-related tasks and what portion to unproductive travel, the court could have directed that he be fully compensated for all of that time, without having had to estimate that half of his travel time was unproductive.

■ The court need not detain itself for long over Foley's next argument in support of a reduction in the fee award, that Hebert and Still should not be compensated for time designated as "review time," or, alternatively, that they should be compensated at 50% of their hourly rates for that time. Foley cites *Jane L. v. Bangerter,* 828 F.Supp. 1544, 1549 (D.Utah 1993), *rev'd on other grounds,* 61 F.3d 1505 (10th Cir.1995), in support of its argument. In that case, the district court reduced the fee award in part because of "several instances where plaintiffs' counsel refer to unspecified or inadequately specified 'review' time," which the court deemed to be "evidence of excess." The court was evidently concerned that the large amount of "review" time in the billing records at issue in *Jane L.* indicated that the attorneys were

"padding" their hours and had failed to adequately exercise billing judgment before submitting their fee application. 828 F.Supp. at 1549.

Here, by contrast, the billing records submitted by Hebert and Still evidence no such sloppiness or intentional overreaching. As the plaintiffs contend, each time entry alluding to the review of a document identifies the document in question, and much of the review time was undertaken in response to specific requests by Foley's counsel. Accordingly, the court does not consider the time devoted to the review of documents as excessive or duplicative, and thus refuses to reduce the fee award on that basis.

■ Turning next to Foley's fourth contention, that Hebert and Still should not be compensated for the 54.65 hours that they devoted to work related to the motions to intervene and the subsequent appeal, the court disagrees with Foley's assertion that its counsel performed all the work on these issues. While it may be true that Foley's counsel pulled the laboring oar in opposing the would-be intervenors' motions and their appeal to the Eleventh Circuit, the plaintiffs' counsel were at the same time responsible for ensuring that their clients own interests, which were certainly not coterminous with those of Foley, were protected. Consequently, the plaintiffs' counsel had a role to play in this process, and they should be compensated for the time they devoted to such tasks as reviewing the briefs and other documents pertaining to the intervention issue, drafting or participating in the drafting of responsive briefs, and related tasks. Accordingly, the court will not reduce the fee award by extracting the time entries related to the motions to intervene.

■ However, the court notes that the plaintiffs' seek compensation for time spent by Hebert and Still related to the would-be intervenors' appeal to the Eleventh Circuit. The district court is not authorized to award such fees on appeal; instead, "If a party wishes to obtain fees on appeal, he or she

must file a petition with the clerk of the clerk of [the Eleventh Circuit] within fourteen days of the issuance of the opinion of [that] court." *Mills v. Freeman,* 118 F.3d 727, 734 (11th Cir.1997); *see also Davidson v. City of Avon Park,* 848 F.2d 172, 173 (11th Cir.1988) ("As to fees for services on appeal, we hold that the district court is not authorized ·... to control the filing time or assessment of attorney's fees for services rendered on appeal.").

A review of the billing records of Hebert and Still shows that they seek compensation for 0.40 and 3.15 hours, respectively, pertaining to the opposition to the would-be intervenors' appeal.[13] These hours will be deducted from the calculation of the lodestar amount.

■ Finally, the court is in partial agreement with Foley regarding its objection to the plaintiffs' request for compensation for time spent litigating the attorneys' fees issue. Hebert and Still seek compensation for 125.95 hours that they devoted to this issue, an amount Foley characterizes as extravagant and punitive. The court agrees that the plaintiffs' counsel overreaches to some degree in seeking compensation for such a large number of hours related exclusively to the fees question.

A review of the record reveals that after the plaintiffs filed their initial motion for a fee award, they filed both a first revised and a second revised motion, in which they sought additional expenses related to the litigation over attorneys' fees. Hebert seeks compensation for 36.50 hours expended during the approximately one-month time period over which these motions were prepared and the fee award issue was litigated, while Still seeks compensation for 23.00 hours during the same period, for a total of 59.50 hours. These additional amounts bring the total number of fees-related hours for which they seek compensation to 125.95.

■ As a threshold matter, it is well-settled that compensation for time expended in pursuit of attorneys' fees is proper. *Johnson v. Mississippi,* 606 F.2d 635, 638 (5th Cir.1979). However, the determination of the extent to which the number of hours claimed were reasonably necessary to adequately address the attorneys' fees issue is left to the district court's discretion. *Id.* Although the court recognizes that the issue of attorneys' fees has been hotly contested, and that Foley has raised numerous objections to the plaintiffs' fee request which have warranted responses by the plaintiffs, it is unwilling to conclude that a total of 59.50 hours, substantially more than a full week of work, constitutes a reasonable amount of time to devote to litigating this issue, especially when this time expenditure comes on top of another 66.45 hours (125.95 hours minus 59.50 hours) spent in attempting to negotiate a settlement and in addressing other matters related to the fee award. Therefore, the court will reduce the number of recoverable hours to the 66.45 hours devoted to settlement efforts and the preparation of the plaintiffs' original motion, plus 50% of the remaining 59.50 hours that were expended after this point, or $0.5 \times 59.5 = 29.75$ hours, for a total of $66.45 + 29.75 = 96.2$ hours. The 29.75 hours are allocated as follows: 18.25 hours for Hebert (50% of his requested 36.50 hours), and 11.50 hours to Still (50% of his requested 23.00 hours).

The court has also conducted an independent review of all of the hours for which compensation is sought to determine if there is any time that should be excluded because it is "excessive, redundant, or otherwise unnecessary." *Hensley,* 461 U.S. at 434, 103 S.Ct. at 1939–40. The court is satisfied that, with the adjustments described above, these hours appear to have been necessary to secure relief in this case. The court further finds that the issues in this lawsuit were somewhat difficult, and that the adjusted hours expended were reasonable in relation to the difficulty of the issues.

Based on this analysis, the court concludes that (1) Hebert is entitled to recover for

---

**13.** The calculation of the amount of time spent on appeal-related matters is complicated by the fact that one entry in Still's time log, comprising 1.90 hours, contains references to both appeal and non-appeal work. The court deems 50% of this time, or .95 hours, to be related to the appeal.

*323.50* hours (381.90 total hours requested minus 0.40 hours related to the would-be intervenors' appeal minus 18.25 hours attributable to fee-award litigation minus 39.75 hours related to travel to be compensated at 50% of hourly rate) at the court-approved billing rate, and *39.75* hours at 50% of that rate; (2) Still is entitled to recover for *135.90* hours (150.55 hours requested minus 3.15 hours related to the appeal minus 11.50 hours attributable to fee-award litigation) at the court-approved billing rate; and (3) Bradley is entitled to recover for *7.20* hours at the court-approved billing rate.[14]

### Prevailing Market Rate

 Next, the court must determine the proper hourly rate at which plaintiffs' counsel should be compensated for the time they expended in this litigation. "A reasonable hourly rate is the prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience, and reputation." *Norman,* 836 F.2d at 1299. Both Hebert and Still contend that they should be compensated at $325 an hour, and Bradley seeks a rate of $225 an hour. To determine the prevailing market rate, the court will consider the following *Johnson* factors: customary fee; whether the fee is fixed or contingent; the novelty and difficulty of the questions; the skill required to perform the legal services properly; the experience, reputation, and ability of the attorneys; time limitations; preclusion of other employment; undesirability of the case; nature and length of professional relationship with the client; and awards in similar cases.

*Customary Fee:* "The customary fee for similar work in the community should be considered." *Johnson,* 488 F.2d at 718. Plaintiffs have submitted affidavits making the general contention that the fee in complex voting rights cases of $325 an hour for attorneys of Hebert and Still's experience is

reasonable. They also cite a number of decisions from civil rights cases in Alabama to establish that federal courts have awarded fees at rates ranging from $225 to $350 per hour. Additionally, Hebert states that his usual and customary hourly fee in non-contingency voting rights cases, where he represents local governments, is $250 per hour. Still states that his usual hourly fee in non-contingent cases is $200 per hour, but that he has been awarded fees of $290 and $350 per hour by courts.

Foley counters that the prevailing non-contingent rate charged by attorneys, in both the Middle District of Alabama and in the state generally, having skills and experience similar to those of Hebert and Still range from $125 to $200, with the average rate well below $200. Foley supports its assertion with numerous declarations and affidavits by attorneys who practice civil rights and other types of federal litigation in Alabama. Foley also notes that it has paid its own attorney at a rate of $170 per hour for his work in this litigation.

The court concludes on the basis of the evidence submitted by the parties that the customary or usual billing rate for civil rights cases, and voting rights cases in particular, ranges from approximately $125 to approximately $350 per hour in certain cases.

*Fixed or Contingent Fee:* "This factor focuses judicial scrutiny solely on the existence of any contract for fees that may have been executed between the party and his attorney." *Medders v. Autauga County Bd. of Educ.,* 858 F.Supp. 1118, 1127 (M.D.Ala.1994) (citing *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 483 U.S. at 723, 107 S.Ct. at 3085). "The fee quoted to the client or the percentage of the recovery agreed to is helpful in demonstrating the attorney's fee expectations when he accepted the case." *Johnson,* 488 F.2d at 718. In this case, there was no written agreement which would demonstrate the fee expectations of any of the plaintiffs' counsel.

---

14. Foley has not specifically objected to the fee request submitted for Bradley, and the court's review of his billing records indicates that the

number of hours for which he seeks compensation is reasonable.

■ *Novelty and Difficulty of the Questions:* "Cases of first impression generally require more time and effort on the attorney's part. Although this greater expenditure of time in research and preparation is an investment by counsel in obtaining knowledge which can be used in similar later cases, he should not be penalized for undertaking a case which may 'make new law.' Instead, he should be appropriately compensated for accepting the challenge." *Johnson,* 488 F.2d at 718.

The issues on which the plaintiffs prevailed—having Foley annex two areas adjacent to the city under a non racially-discriminatory process—and the legal and factual questions raised by these issues were relatively complex. Further, the law on the voting rights of minorities is evolving and changing almost daily. *See, e.g., Bush v. Vera,* 517 U.S. 952, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996); *Shaw v. Hunt,* 517 U.S. 899, 116 S.Ct. 1894, 135 L.Ed.2d 207 (1996).

However, the court also notes that although the liability issues in this case were complex, much of the time for which Hebert and Still seek compensation related to negotiations over the precise details of the annexation process, and their attorneys' fees award. The legal and factual questions that they faced regarding these issues were less complicated than those concerning liability issues, a factor that favors a lower hourly rate for their work.

*Skill Required to Perform the Legal Services Properly:* "The trial judge should closely observe the attorney's work product, his preparation, and general ability before the court. The trial judge's expertise gained from past experience as a lawyer and his observation from the bench of lawyers at work become highly important in this consideration." *Johnson,* 488 F.2d at 718.

Complex federal civil rights cases, and especially voting rights actions, require skilled attorneys. Hebert, Still and Bradley all met this standard and performed the work that was required in a professional manner.

*Experience, Reputation, and Ability of the Attorneys:* "Most fee scales reflect an experience differential with the more experienced attorneys receiving larger compensation. An attorney specializing in civil rights cases may enjoy a higher rate for his expertise than others, providing his ability corresponds with his experience." *Johnson,* 488 F.2d at 718.

Hebert, Still and Bradley are all experienced attorneys. Hebert has over 20 years of legal experience, including 21 years with the Civil Rights Division of the United States Department of Justice. During his last 15 years at the Justice Department, Hebert specialized in voting rights litigation, and he was lead counsel on numerous major voting rights cases.

Still has well over 20 years of legal experience, and has developed a strong reputation as an attorney specializing in voting rights and other civil rights litigation. Bradley also has well over 20 years of legal experience and has developed a strong reputation in voting rights and other civil rights litigation.

Moreover, as stated, this case was relatively complex, and the work done by Hebert, Still, and Bradley was of the highest caliber. More importantly, the court is convinced that their expertise enabled Hebert and Still to prosecute this case very efficiently.[15] Attorneys with less knowledge and experience would have taken many more hours to pursue this litigation. Therefore, their "efficiency justifies an hourly rate at the high end of the customary range." *White v. Alabama,* No. 94–T–94–N, 1996 WL 378235, at *5 (M.D.Ala. June 20, 1996) (quoting *Gay Lesbian Bisexual Alliance v. Sessions,* 930 F.Supp. 1492, 1497 (M.D.Ala.1996)); *see also Coleman v. Cannon Oil Company,* 911 F.Supp. 510, 515 (M.D.Ala.1995) ("A lawyer already skilled in the area could demand a higher rate because he or she would be more knowledgeable and could work more effi-

---

**15.** This observation is less relevant to Bradley's work, because he was involved almost exclusively with defending depositions on the fee award issue and other related tasks, and not with the substantive litigation.

ciently"); *Dillard v. City of Elba*, 863 F.Supp. 1550, 1553 (M.D.Ala.1993) (experienced attorneys prosecuted case in fewer hours than inexperienced attorneys would have); *Curry v. Contract Fabricators Inc. Profit Sharing Plan*, 744 F.Supp. 1061, 1071 (M.D.Ala.1988) (attorney's "inexperience should be reflected in [lower] ... hourly rate"), *aff'd*, 891 F.2d 842 (11th Cir.1990).

*Time Limitations:* Where there has been "[p]riority work that delays the lawyer's other legal work," this factor requires "some premium." *Johnson*, 488 F.2d at 718. There is no evidence of such limitation here.

*Preclusion of Other Employment:* This factor "involves the dual consideration of otherwise available business which is foreclosed because of conflicts of interest which occur from the representation, and the fact that once the employment is undertaken the attorney is not free to use the time spent on the client's behalf for other purposes." *Johnson*, 488 F.2d at 718. Hebert represents that this litigation was his principal case during the first year or so after he left the Department of Justice, and that he devoted substantial time to it during that period. This factor thus militates slightly, if at all, in favor of a higher fee for Hebert.

*Undesirability of the Case:* "Civil rights attorneys face hardships in their communities because of their desire to help the civil rights litigant.... Oftentimes his decision to help eradicate discrimination is not pleasantly received by the community or his contemporaries." *Johnson*, 488 F.2d at 718. Moreover, civil rights litigation is seen "as very undesirable because it stigmatizes an attorney as a 'civil rights lawyer' and thus tends to deter fee-paying clients, particularly high-paying commercial clients, from seeking assistance from that lawyer." *Stokes v. City of Montgomery*, 706 F.Supp. 811, 815 (M.D.Ala. 1988), *aff'd*, 891 F.2d 905 (11th Cir.1989) (table).[16] The results of such litigation tend to arouse the emotions of all concerned, and frequently the attorneys who bring these cases are the subjects of prolonged and vitriolic hostility. This factor "can have an economic impact on [an attorney's] practice which can be considered by the Court." *Johnson*, 488 F.2d at 718.

This was a somewhat undesirable case for several reasons. In general, civil rights litigation is seen as undesirable for the reasons described above. In addition, this was a politically-charged case in the city of Foley and the affected areas, as evidenced in part by the animated discussions during the Foley City Council meeting held to address annexation concerns.

*Nature and Length of Relationship with Client:* There is no evidence that any of the plaintiffs' counsel had any prior professional relationship with the plaintiffs.

*Awards in Similar Cases:* "The reasonableness of a fee may also be considered in the light of awards made in similar litigation within *and* without the court's circuit." *Johnson*, 488 F.2d at 719. The court has awarded non-contingent fees in the range of $125 to $290 an hour in other civil rights cases. *See, e.g., White v. Alabama*, No. 94–T–94–N, 1996 WL 378235, at *6 (M.D.Ala. June 20, 1996); *Gay Lesbian Bisexual Alliance*, 930 F.Supp. at 1498; *Reynolds v. Alabama Dep't of Transp.*, 926 F.Supp. 1448, 1459 (M.D.Ala.1995); *Coleman*, 911 F.Supp. at 516; *Lee v. Randolph County Bd. of Ed.*, 885 F.Supp. 1526, 1531–32 (M.D.Ala.1995); *James v. City of Montgomery*, 1995 WL 271138 (M.D.Ala. April 19, 1995); *Stokes v. City of Montgomery*, 157 F.R.D. 514, 519 (M.D.Ala.1994); *City of Elba*, 863 F.Supp. at 1554; *Medders*, 858 F.Supp. at 1129; *Wyatt v. King*, no. 3195–N, 1991 WL 640065, at *3 (M.D.Ala. Dec.17, 1991), *aff'd*, 985 F.2d 579 (11th Cir.1993) (table); *Robinson v. Alabama State Dept. of Educ.*, 727 F.Supp. 1422, 1428 (M.D.Ala.1989), *aff'd*, 918 F.2d 183 (11th Cir. 1990) (table); *Stokes*, 706 F.Supp. at 815.

Additionally, this court has twice awarded Still attorneys' fees in voting rights cases at

---

**16.** *See also Medders*, 858 F.Supp. at 1128; *Robinson v. Alabama State Dept. of Educ.*, 727 F.Supp. 1422, 1428 (M.D.Ala.1989), *aff'd*, 918 F.2d 183 (11th Cir.1990) (table).

the rate of $290 per hour. *See Medders,* 858 F.Supp. at 1127–28; *City of Elba,* 863 F.Supp. at 1553–54.

Although the court, based on the foregoing criteria, disagrees with Foley that Hebert and Still should be compensated at the same rate as Foley's attorney ($170 per hour), it finds that the $325 per hour rate sought by Hebert and Still is unreasonably high. The court concludes instead that Hebert and Still are entitled to $250 an hour. In arriving at this figure, the court particularly considers that while both attorneys are preeminent in their specialty and enjoy reputations that are national in scope, many of the non-liability issues they faced in this lawsuit were less complex than in other voting rights cases, including those cited above in which Still was compensated at $290 per hour.

The court also finds that Bradley is entitled to $225 per hour, again due in large part to his years of experience and fine reputation as a civil rights attorney.

### Lodestar Calculation

The unadjusted lodestar for an attorney consists, as stated, of the product of the attorney's compensable hours multiplied by the prevailing market fee. The lodestars for the plaintiffs' attorneys are therefore calculated as follows:

| Hebert: | 323.50 hours × $250 | = | $ 80,875.00 |
| | 39.75 hours × $125 | = | $ 4968.75 |
| | | | $ 85,843.75 |
| Still: | 135.90 hours × $250 | = | $ 33,975.00 |
| Bradley: | 7.20 hours × $225 | = | $ 51,620.00 |
| TOTAL: | | | $121,438.75. |

### Adjustment of Lodestars

Foley proffers two arguments as to why the lodestars in this case should be significantly reduced. First, Foley contends that a reduction is warranted because it had already commenced the annexation process by the time the plaintiffs filed their motion for further relief, and because the city demonstrated a clear willingness to negotiate from the very outset of the litigation, as evidenced by the alacrity with which a settlement was reached. Second, Foley maintains that the overall fee award sought by the plaintiffs is so excessive that if granted it would simultaneously produce an impermissible windfall for plaintiffs' counsel and discourage efforts to achieve early settlement in future cases.

In support of its first contention, Foley cites both *Craig v. Gregg County,* 988 F.2d 18 (5th Cir.1993), and *Alexander v. Mayor and Council of Cheverly,* 953 F.2d 160 (4th Cir.1992). As the court has already explained, *Craig* is distinguishable from the instant dispute because here there is ample evidence to establish that the plaintiffs' efforts in this litigation were necessary to keep Foley's feet to the fire in pursuing the annexation of Beulah Heights and Mills Quarters. Regarding *Alexander,* the court notes that although that decision contemplates that a willingness to negotiate settlement may favor a reduction in a fee award, there is no question that whether to reduce the award is within the sound discretion of the district court. *See* 953 F.2d at 162. On the basis of the record before it, the court sees no reason why the lodestars should be adjusted to account for Foley's willingness to negotiate in order to avoid a trial on the merits of the plaintiffs' claims.

While this court finds that Foley's early willingness to pursue settlement negotiations aimed at bringing this litigation to a quick and satisfactory conclusion is certainly laudable, it will not reduce the fee award solely on this basis. Instead, it observes that Foley's openness to negotiation is reflected in the size of the overall fee award, which undoubtedly is greatly reduced relative to what it would have been had the case proceeded through the discovery phase and into a full trial on the merits.

Regarding Foley's contention that the fee award sought in this case confers an impermissible windfall on the plaintiffs' counsel and would discourage future efforts to settle cases, the court notes, first, that the plaintiffs' counsel's efforts in this litigation took place over a very active period of over two

years, including investigation time prior to the filing of the motion for further relief. Thus, regardless of whether Foley in fact intended to settle this litigation quickly, and despite its attempts to characterize this case as having been rapidly settled with little ado, it took a significant length of time, and the exertion of a great deal of effort by attorneys for both parties, to resolve all of the disputed issues concerning the annexations. Under these circumstances, it can hardly be said that the plaintiffs' attorneys have obtained an improper windfall because they are being compensated at a reasonable rate for their successful efforts on their clients' behalf.

Nor does the court agree that the fee award in this case will stifle future efforts to achieve early settlement of similar cases. As stated, the hours expended by counsel for both parties have been reduced relative to what they would have been had this action proceeded through discovery, trial, and perhaps an appeal to the Eleventh Circuit. Thus, Foley has not lost the benefits of having reached a relatively early settlement of this matter, simply because it is compelled to compensate the plaintiffs' counsel for their reasonable time spent on the litigation. Anyone familiar with this record would recognize the time and cost savings of early settlement here, and would not be discouraged from pursuing early settlement of future cases.

### Expenses

The plaintiffs seek $ 10,826.87 for expenses (Hebert—$ 9,726.91 and Still—$ 1,099.96) incurred in connection with the litigation. With the exception of routine overhead office expenses normally absorbed by the practicing attorney, all reasonable expenses incurred in case preparation, during the course of litigation or as an aspect of settlement of the case, may be taxed as costs; the standard of reasonableness is to be given a liberal interpretation. *Loranger v. Stierheim*, 3 F.3d 356, 363 (11th Cir.1993); *NAACP v. City of Evergreen*, 812 F.2d 1332, 1337 (11th Cir.1987); *Dowdell v. City of Apopka*, 698 F.2d 1181, 1192 (11th Cir.1983).

The expenses claimed by Hebert and Still appear to be reasonable, and the court therefore determines that they are recoverable, with one exception. As discussed above, the court agrees with Foley that the plaintiffs could have retained Alabama counsel in this litigation, and on that basis concluded that Hebert should be compensated at 50% of his standard hourly rate for non-productive travel time between out-of-state locations and Alabama. Similarly, the court will discount by 50% all of Hebert's travel expenses ($ 9,319.70) incurred during such travel to reflect the fact that local counsel could have been retained.

Therefore, the court will award Hebert his expenses as follows: $ 407.21 for postage, telephone and other miscellaneous expenses plus $ 4,659.85 ($ 9,319.70 × 0.5) for miscellaneous travel expenses, for a total of $ 5,067.06 in expenses. The court will award Still his requested expenses of $ 1,099.96. The total expenses awarded is therefore $ 6,167.02.

Accordingly, for the above reasons, it is ORDERED that the motion for award of attorney's fees, costs and expenses, filed by plaintiffs John Dillard, et al., on July 30, 1996, and amended on August 23 and October 2, 1996, is granted, and that plaintiffs Dillard, et al., shall have and recover from defendant City of Foley the sums of $ 121,-438.75 for attorney's fees and $ 6,167.02 for expenses, for a total amount of $ 127,605.77.